**Alan D. GORDON, M.D.; Alan D. Gordon, M.D., P.C.; Mifflin County Community Surgical Center, Inc., Plaintiffs**

v.

**LEWISTOWN HOSPITAL, Defendant**

**No. CIV.1:CV–99–1100.**

United States District Court, M.D. Pennsylvania.

July 11, 2003.

John B. Huck, Bluffton, SC, Orris C. Knepp, III, Knepp and Snook, Lewistown, PA, George M. Sanders, Steven B. Varick, Holland & Knight, LLC, Chicago, IL, for Alan D. Gordon, M.D., P.C.

Kathleen Chancler, Mark L. Mattioli, Jonathan B. Sprague, Post & Schell, Philadelphia, PA, Susan M. Lapenta, Horty, Springer & Mattern, Pittsburgh, PA, Michael D. Pipa, Harrisburg, PA, Craig A. Stone, Mette, Evans & Woodside, Harrisburg, PA, for Lewistown Hosp.

David E. Loder, Duane Morris, LLP, Philadelphia, PA, for Hospital and Healthsystem Ass'n of Pa.

Jeffrey B. Rettig, Hartman, Osborne & Rettig, P.C., Harrisburg, PA, for Penn State Geisinger Health.

Henry S. Allen, Jr., Robert W. Queeney, McBride, Baker and Coles, Chicago, IL,

## MEMORANDUM FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAMBO, District Judge.

## TABLE OF CONTENTS

*TABLE OF CONTENTS* .................................................397

*MEMORANDUM* .................................................397

I. *Findings of Fact* .................................................398
 A. *The Parties* .................................................398
 B. *The Credentialing Policy and the Peer Review Process* .................399
 C. *Dr. Gordon and Dr. Nancollas: A Comparison* .........................399
 D. *The Relevant History of Dr. Gordon's Tenure* ........................401
 1. The 28 Day Suspension .................................................401
 2. The 45 Day Suspension .................................................401
 3. The Intervening Summary Suspension .................................403
 4. The 1996 Conditions of Reappointment .................................403
 5. The Gordon/Nancollas Advertising War .................................405
 6. The Hospital Revokes Dr. Gordon's Privileges. .......................406
 a. The June 4, 1997 Letter .................................................406
 b. The Margaret Seecora Phone Call .................................407
 c. The Hospital's Decision to Revoke Dr. Gordon's Privileges .......407
 E. *The Hospital's Allegedly Predatory Tactics* .........................408
 1. The Hospital's Relationship with Geisinger .........................408
 a. The Medical Office Building Lease .................................408
 b. Efforts to Recruit Other Ophthalmologists .......................409
 2. Dr. Everhart's Surgical Center .................................409
 3. The Transfer Agreement .................................................411
 4. Efforts to Discourage Other Physicians from Practicing at MCCSC .................................................412
 F. *Relevant Antitrust Markets* .................................................413

 G. *Dr. Gordon's Credibility* ............................................. 413
 H. *Procedural History* ............................................... 414

II. *Discussion* ....................................................... 415
 A. *Count I: Unreasonable Restraint on Trade* ............................ 415
 1. **Plaintiffs' Initial Burden** ........................................ 416
 a. Concerted Action ........................................... 416
 i. The Conditions of Reappointment ........................... 417
 ii. The Alleged Conspiracy with Dr. Everhart..................... 418
 b. Market Power ............................................. 419
 i. Product Markets ........................................... 420
 ii. Geographic Markets and Market Share........................ 425
 -*Outpatient Cataract Facility Services* ...................... 425
 -*Inpatient Eye Surgery Facility Services* ...................... 434
 -*Emergency Eye Surgery Facility Services* .................... 435
 iii. Market Analysis Conclusion................................. 436
 c. Actual Anti–Competitive Effects .............................. 437
 d. Summation of Plaintiffs' Initial Burden ........................ 441
 2. **The Hospital's Pro–Competitive Objective** ......................... 442
 3. **Plaintiffs' Ultimate Burden** ...................................... 443
 B. *Count II: Illegal Tying Arrangement* ................................ 446
 1. *Per Se* **Analysis**................................................ 446
 2. **Rules of Reason Analysis** ........................................ 447
 C. *Count III: Attempted Monopolization* ............................... 448
 D. *Other Pending Motions* ........................................... 449
 E. *Evidentiary Matters* .............................................. 449

III. *Conclusions of Law* ............................................... 450

*APPENDIX* ............................................................. 450

*ORDER* ............................................................... 463

Between April 3 and April 23, 2002, the court conducted a non-jury trial in the captioned matter. The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. *Findings of Fact*

### A. *The Parties*

Plaintiffs in this action are Dr. Alan Gordon, M.D., Alan Gordon, M.D., P.C., and Mifflin County Community Surgical Center, Inc ("MCCSC"). Dr. Gordon is an ophthalmologist practicing in Lewistown, Pennsylvania. Alan Gordon, M.D., P.C. is a Pennsylvania professional corporation organized in 1981. MCCSC is a Pennsylvania corporation organized in 1998 and operating in Lewistown. Dr. Gordon is the sole stockholder in both MCCSC and Alan Gordon, M.D., P.C.

Defendant, Lewistown Hospital ("the Hospital"), is a general medical and surgical hospital. The Hospital provides primary and secondary levels of acute inpatient care. It also furnishes outpatient surgical facility services. The Hospital is the only hospital located in the area of Mifflin and Juniata Counties, Pennsylvania. The Hospital engages in activities which affect interstate commerce.

The Hospital, like most hospitals in the United States, has an organizational structure with three primary components. First, the Hospital has a Board of Trustees ("the Board") which has final decision-making authority on issues affecting the Hospital. Second, the Hospital's administration staff, led by the Hospital's Chief

Executive Officer ("CEO"), oversees day-to-day operations. The Hospital does not employ any physicians. Instead, it grants physicians staff privileges to practice at the Hospital. These physicians compose the Hospital's third primary component, the Medical–Dental Staff. A physician must be a member of the Medical–Dental Staff to practice at the Hospital.

### B. *The Credentialing Policy and the Peer Review Process*

As part of its relationship with the Hospital, the Medical–Dental Staff engages in a process known as "peer review." During this process, select members of the Medical–Dental Staff, known as "the Credentials Committee," make recommendations to the Board on whether a particular physician meets the minimum professional requirements to practice at the Hospital. These decisions involve determining whether a physician should be admitted to the Medical–Dental Staff and, once admitted, whether a physician's privileges should be renewed. The Credentials Committee's decisions are guided by the Hospital's Credentialing Policy, which sets forth the minimum professional requirements for physicians practicing at the Hospital. The Medical–Dental Staff initially adopted the Hospital's Credentialing Policy in 1991. The Board approved the Credentialing Policy that same year. The most recent revisions to the Credentialing Policy occurred in February, 1997.

The Credentialing Policy states that "[a]ppointment to the medical staff is a privilege which shall only be extended to professionally competent individuals who continuously meet the qualifications, standards and requirements set forth in this policy and in such policies as are adopted from time to time by the Board." (Def.Ex. 227(A)(1) at Article II, Part A, § 1.) Among other requirements, the Credentialing Policy states that only those physicians who can document "adherence to the ethics of their profession" and an "ability to work harmoniously with others" are qualified for staff privileges at the Hospital. (*Id.* at §§ 2(d)(2) and (4).) To be eligible for reappointment to the Medical–Dental Staff, a physician must agree "to abide by all bylaws and policies of the hospital, [the Credentialing] policy and rules and regulations of the medical staff as shall be enforced from time to time during the time the individual is appointed to the medical staff. . . ." (*Id.* at Article II, Part C, § 2(b).)

The instant antitrust action arises out of the Hospital's decision to conditionally reappoint Dr. Gordon to the Medical–Dental Staff and its ultimate decision to revoke his privileges for violating those conditions. Plaintiffs claim that these actions constitute violations of Sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. §§ 1 and 2.

### C. *Dr. Gordon and Dr. Nancollas: A Comparison*

Dr. Gordon was initially appointed to the Hospital's Medical–Dental Staff in 1980. In 1982, Dr. Gordon became a certified member of the American Board of Ophthalmology. In 1989, he became a certified member of the American Board of Eye Surgeons. Dr. Gordon is widely respected as a surgeon. His medical competence is not at issue in this case.

In July of 1989, Dr. Paul Nancollas, M.D., joined the Medical–Dental Staff as an ophthalmologist. At all times since he joined the Hospital, Dr. Nancollas has been a member of the Geisinger Group–Lewistown, a group of physicians in Lewistown associated with the Geisinger Corporation. In 1991, Dr. Nancollas became certified by the American Board of Ophthalmologists. Unlike Dr. Gordon, however, Dr. Nancollas is not certified by the American Board of Eye Surgeons. Through 1997, both doctors performed cat-

aract removal surgery, although the two employ different procedures.[1] At the time he joined the Hospital, Dr. Nancollas performed what is called a "planned extracapsular cataract extraction" ("ECCE" or "extracapsular extract").

During ECCE, the physician makes an eight to twelve millimeter ("mm") incision in the patient's eye, removes the cataract (either in whole or in several fragments), and then inserts an artificial intraocular lens through the incision. Given the length of the incision required, the physician will normally make his incision in the sclera, the white vascular portion of the eye. This relatively large incision also necessitates that the physician use stitches to secure the wound structure while the eye heals.

For almost the entire length of his professional career, Dr. Gordon has primarily used a different cataract removal procedure, "phacoemulisification" ("phaco procedure" or "phaco"). During a phaco procedure, the physician can make a smaller incision, typically three to five mm. Dr. Gordon usually makes a 2.8 mm multiplane incision in the cornea which requires no stitches to heal. After making the incision, a physician performing phaco inserts a microsurgical instrument—called a phacoemulsifier—through the incision. The phacoemulsifier uses ultrasonic energy to break the cataract into many, very small fragments. The physician then suctions out the fragments through the incision. Because of the smaller incision, a physician using phaco may make his incision in the cornea as opposed to the sclera. Unlike the sclera, the cornea is not vascularized.

Therefore, making the incision in the cornea exposes a patient to less risk of complications. Additionally, the recovery time for phaco procedures is generally shorter than ECCE procedures. For these reasons, by the mid–1990s, phaco became the preferred procedure of ophthalmologists in the United States.[2] Both procedures, however, are still practiced, and neither falls below the standard of care for outpatient cataract surgery.

The incision is not the only difference between Dr. Gordon's and Dr. Nancollas' surgical methods. Once he removes the cataract, Dr. Nancollas implants a seven mm non-foldable, rigid intraocular lens. Dr. Gordon, on the other hand, uses a foldable lens that he inserts through his smaller incision. Use of both lenses, however, falls within the applicable standard of care. Moreover, from the patient's perspective, the use of a foldable or non-foldable lens does not affect their ability to see.

The two physicians also employ different methods of anesthesia. Dr. Gordon generally uses only local topical anesthesia. That is, before surgery begins, Dr. Gordon bathes the patient's eye with a pledgit, a small piece of cotton soaked with local anesthesia and a dilating agent. The local anesthesia numbs the area around the eye. The patient is conscious throughout the procedure, and no injections are required. If the patient feels some discomfort during the procedure, Dr. Gordon uses eye drops containing anesthesia to relieve the pain.

On the other hand, Dr. Nancollas uses a peribulbar block to anesthetize his patients

---

1. "A cataract is a clouding of the normally clear lens of your eye. The Latin word *cataracta* means 'waterfall'—imagine trying to peer through a sheet of falling water or through a frosty or fogged-up window. Clouded vision can make it more difficult to read, drive a car or see the expression on your friend's face." *Http://www.mayoclinic.com/invoke.cfm?id=DS00050* (last visited June 17, 2003).

2. Dr. Nancollas has since switched to phaco, although he still uses an approximately seven mm incision which requires stitches.

for surgery. A peribulbar block requires that the physician inject a needle containing anesthesia into the portion of the muscle cone[3] directly below the eyeball.[4] In both forms of periocular anesthesia—peribulbar and retrobulbar blocks—the doctor makes an injection without being able to see the end of the needle. This is important because, without being able to see the end of the needle, there is a greater risk that the physician will inadvertently puncture the ocular nerve, causing severe damage to the eye and other components of the central nervous system.

Because a peribulbar block injection is both painful and shocking to the patient, Dr. Nancollas gives his patients a sleep dose of general anesthesia, via an intravenous line, before administering the block. As a result, risks uniquely associated with Dr. Nancollas' anesthetic method include perforation of the eyeball, respiratory arrest, hemorrhage, eechymoses (bruising), and ptosis (droopy eyelid). Although a peribulbar block exposes a patient to more complications than does topical anesthesia, both methods are within the standard of care. In fact, a majority of cataract surgeons who now employ the phaco procedure still use either a retrobulbar or peribulbar block to anesthesize their patients. With the rare exceptions of a retrobulbar hemorrhage—which was self-limiting and did not damage the patient's eye—and a case of ptosis—which did not interfere with the patient's vision and resolved once

post-operative swelling subsided—Dr. Nancollas' patients have not experienced any complications from his choice of anesthesia.

### D. *The Relevant History of Dr. Gordon's Tenure*

#### 1. The 28 Day Suspension

Following a series of incidents involving Dr. Gordon and other physicians and nurses in late 1991 and 1992, the Credentials Committee recommended that the Board suspend Dr. Gordon's privileges for a period of twenty-eight days.[5] The Board agreed, and on August 3, 1992, then-Hospital President William DeWire wrote Dr. Gordon, informing him of the suspension. The Credentials Committee purposely chose a twenty-eight day suspension period to avoid reporting the matter to the National Practitioner Databank.[6] The Committee wanted to send Dr. Gordon a message regarding his behavior and ability to work with others, without significantly inhibiting his ability to practice medicine.

#### 2. The 45 Day Suspension

In 1994, the Hospital began to receive complaints from patients and their families regarding harassing, inappropriate, and intimidating phone calls from Dr. Gordon. During these conversations, Dr. Gordon would attack and belittle the patients for choosing Dr. Nancollas as their ophthalmologist. Specifically, John Whitcomb,

---

3. The muscle cone is the area of muscle which encases the eyeball and the ocular nerve.

4. When he first began at the Hospital, Dr. Nancollas employed a retrobulbar block in which he would insert the needle into the area of the muscle cone behind the eye.

5. The events giving rise to this suspension are not relevant to the outcome of this case. *See Gordon v. Lewistown Hosp.*, CV:1–99–1100, order (M.D.Pa. Nov. 8, 2001) (holding that the

Hospital may only present evidence of Dr. Gordon's conduct with respect to incidents which occurred after 1990 and have a bearing on its decision to impose Conditions 2 and 3 of the Conditions of Reappointment). Accordingly, the court will not go into any detail about these matters, except to note that Dr. Gordon had notice that he was being disciplined for these actions.

6. The Hospital must report any suspension of over thirty days.

Hospital CEO and President from 1993 through May of 1997, received a letter from a former Dr. Gordon patient, Helen Miller. This seventy-two year old woman indicated to Whitcomb that Dr. Gordon complained to her about her decision to switch to Dr. Nancollas.

Additionally, Marilyn Shupp complained to Dr. Dan Creighton, former Chairman of the Credentials Committee, that Dr. Gordon had called her mother, Mary Lontz—another former patient of Dr. Gordon—the night before Lontz was scheduled to have cataract surgery with Dr. Nancollas. During that conversation, Dr. Gordon complained about Lontz's decision to use Dr. Nancollas.

Whitcomb also received a complaint from Ardella Paige that Dr. Gordon contacted her to inquire as to why she switched to Dr. Nancollas. On February 10, 1995, Whitcomb received yet another letter from a patient, Mildred Goss, complaining of Dr. Gordon's conduct. In that letter, Goss, a former patient of Dr. Gordon, explained that she received a phone call from Dr. Gordon inquiring as to why she decided to use Dr. Nancollas to treat an emergency eye problem. According to Goss, she told Dr. Gordon that an optometrist from Lewistown had referred her to Dr. Nancollas because Dr. Gordon was not available. Dr. Gordon responded by calling her "a liar" and then "ridiculed Dr. Nancollas and said he was still a student and wasn't able to operate for cataracts." (Def.Ex. 226(a)(17).)

As a result of these troubling complaints, Hospital counsel wrote two letters to Dr. Gordon's counsel indicating that if the Hospital were to receive additional complaints from patients, the matter would be referred to the Medical–Dental Staff for investigation. Despite these warnings, Dr.

Gordon's behavior did not abate. The Administration received two additional complaints from patients indicating that Dr. Gordon had placed unwanted and unsolicited calls to them complaining about their decision to use Dr. Nancollas.

Additionally, Whitcomb received a complaint regarding Dr. Gordon's behavior in the Same Day Surgery Unit on August 24, 1994. On that day, a nurse complained that Dr. Gordon failed to dictate a medical history and physical for one of his patients awaiting surgery. Despite being instructed twice that he would have to complete the dictation before the patient would be allowed into surgery, Dr. Gordon did not do so. When Dr. Gordon was reminded a third time, he simply wrote "heart and lungs clear" on the patient's record. The nurse refused to accept the record and would not allow Dr. Gordon to take the patient into the operating room. In response, Dr. Gordon stated in a loud voice that the nurse who refused to release his patient to surgery "didn't give a damn about the patients...." (Def.Ex. 226(I) at ¶ II.B.) Dr. Gordon also screamed at the nurses on staff, "you are all assholes." (*Id.*) These statements were made in front of several patients.

Whitcomb referred these complaints to the Credentials Committee for investigation. On November 29, 1995, the Credentials Committee issued its finding that, among other things,[7] Dr. Gordon had engaged in a series of inappropriate and harassing phone calls to patients and had acted inappropriately in the Same Day Surgery Unit on August 24, 1994. As a result, the Credentials Committee recommended that Dr. Gordon be suspended for forty-five days. By letter dated December 5, 1995, Whitcomb informed Dr. Gordon of the Credentials Committee's decision and

---

7. The Credentials Committee also found that Dr. Gordon engaged in two other instances of misconduct, neither of which is relevant to this case. *See supra* at fn. 5.

his right to appeal that matter to a neutral arbitrator.

Dr. Gordon appealed that decision to the arbitrator. On July 1, 1996, the arbitrator issued her decision upholding the suspension. With regard to the incident in the Same Day Surgery Unit, the arbitrator found that Dr. Gordon inappropriately "chose to publicly confront the nurse. Not only was this disruptive, but it was ineffective in obtaining the result he sought. It was reasonable for the Credentials Committee to base Dr. Gordon's suspension, in part, on this behavior." (*Id.*) Additionally, the arbitrator criticized Dr. Gordon for his phone calls to former patients harassing them about choosing Dr. Nancollas as their ophthalmologist. With respect to these calls, the arbitrator stated:

> Dr. Gordon did not deny these calls occurred, although he could not recall the exact circumstances of several calls. He testified that he made the calls so that patients would look into alternatives, at the same time acknowledging that the calls would have the effect of increasing a patient's anxiety and that patients could do little, if anything, to explore their alternatives on the eve of surgery. These phone calls show extremely poor judgment, and are, in my view, cruel to the patients about whom Dr. Gordon professes to care. Once again, whether Dr. Gordon's concerns about the adequacy of other physicians and other procedures are real is not the issue. *The issue is that the manner in which Dr. Gordon has chosen to express his concerns is unacceptable and disruptive to the Hospital.* The recommendation of the Credentials Committee to suspend Dr. Gordon's privileges for 45 days, based in part on these telephone calls, was reasonable and supported by the evidence.

(*Id.* at ¶ II.C (emphasis added).) The Hospital reported the suspension to the National Practitioner Databank.

### 3. The Intervening Summary Suspension

While Dr. Gordon was exhausting his appellate rights regarding the forty-five day suspension, Whitcomb received several more complaints from patients, physicians, and nurses regarding Dr. Gordon's conduct.[8] As a result, the Hospital summarily suspended Dr. Gordon's privileges on April 19, 1996, pending resolution of the appeal regarding the forty-five day suspension. Dr. Gordon also appealed the summary suspension to the arbitrator. By a letter dated May 20, 1996, the arbitrator upheld the summary suspension.

### 4. The 1996 Conditions of Reappointment

During this period, the Hospital had before it Dr. Gordon's application for staff reappointment for the period from February, 1995 to January 1, 1997. As the events described above unfolded, the Credentials Committee considered denying the application. On August 2, 1996, Dr. Charles Everhart, Chairman of the Credentials Committee, wrote Dr. Gordon explaining the Hospital's position:

> The Credentials Committee has a very long history of dealing with problems created by your behavior and of imposing conditions and discipline in an effort to make you understand that your behavior cannot continue. A vastly disproportionate share of the Credentials Committee's time and of the Hospital's resources have been devoted to problems created by you. This is notice to you that those extensive efforts on your behalf are over. You will not be recommended for reappointment unless the

---

8. *See supra* at fn. 5.

Credentials Committee receives from you, absolute, credible assurances that you understand that your behavior has been inappropriate and that, in the future, you will consistently conduct yourself strictly in accordance with [the] standards outlined in this letter and with all hospital and medical staff bylaws and policies.

(Def.Ex. 227(A)(6) at ¶ 10.)

On August 14, 1996, Dr. Gordon responded to Dr. Everhart's letter stating, among other things:

*I will use the administrative channels to register complaints* or concerns about poorly functioning equipment, or *about others practicing at the hospital* or assisting me.

. . . . .

I find that my phone calls to patients were counterproductive and I stopped making these calls in late 1995. Although I feel that patients ought be informed of their situation, I have not called patients for sometime *nor is it my intention to call or otherwise attempt to communicate with the patients of any other ophthalmologist for the purpose of commenting on that physician's training, skill, or competency* or the procedure performed by such physician.

(Def.Ex. 227(A)(7) (emphasis added).)

Despite Dr. Gordon's conciliatory rhetoric, within a few weeks of returning to the Hospital after the forty-five day suspension, Dr. Gordon was involved in yet another incident. On September 5, 1996, Dr. Gordon and another physician engaged in a shouting match on the Hospital's third floor. Apparently, Dr. Gordon was infuriated because the other physician had referred a patient to Dr. Nancollas. Although Dr. Everhart—speaking on behalf of the Credentials Committee—expressed his displeasure regarding Dr. Gordon's involvement in the incident, no disciplinary action was taken against Dr. Gordon as a result of this event.

In a letter dated September 30, 1996, Dr. Everhart, writing on behalf of the Credentials Committee, indicated that the Hospital would recommend that Dr. Gordon be reappointed to the Medical–Dental Staff contingent upon his acceptance of seventeen "Conditions for Reappointment." On October 10, 1996, after consulting with counsel, Dr. Gordon agreed to the Conditions of Reappointment. On November 11, 1996, Robert Postal, Chairman of the Board of Trustees, wrote to Dr. Gordon indicating that the Board had accepted the Credentials Committee's recommendation of conditional reappointment. Postal, again, requested that Dr. Gordon indicate his willingness to abide by the Conditions of Reappointment. On November 14, 1996, Dr. Gordon signed a document stating, "I accept the above conditions relative to my reappointment and renewal of privileges at Lewistown Hospital and intend to be legally bound thereby." (Def.Ex. 227(A)(11) at p. 4.)

At issue in the instant litigation are Paragraphs 2 and 3 of the Conditions for Reappointment, which required the following:

(2) You [Dr. Gordon] must use appropriate administrative channels to register *any complaint or concern that you might have about others practicing at the Hospital. Specifically, any complaint or concern about any other member of the Medical–Dental Staff must be in writing addressed to either the President of the Medical Staff or the Chairperson of the Credentials Committee, with a copy to the President of the Hospital.* Any complaint or concern about any nursing personnel shall be reported in writing to that individual's supervisor, with a copy to the President of the Hospital. Any other complaint or con-

cern about scheduling, equipment or any other matter must be in writing directed to the President of the Hospital;

(3) *You shall not call, or otherwise attempt to communicate with, the patients of any other ophthalmologist, or other physician practicing in the Hospital, for the purpose of commenting on the physician's training, skill or competence or the procedure performed by such physician.* Furthermore, other than in response to a specific question or for the purpose of a referral, you shall not make any comment about any other ophthalmologist as part of your discharge instructions or at any time when dealing with patients who have been or will be treated at the Hospital.

(*Id.* (emphasis added).)

Dr. Gordon contends that these two paragraphs constitute an unreasonable restraint on trade. The court, however, finds that Conditions 2 and 3 were reasonable in light of Dr. Gordon's past conduct and did not impermissibly restrain trade in any relevant antitrust market at issue in this case.[9]

## 5. The Gordon/Nancollas Advertising War

Throughout the 1990s, both Dr. Gordon and Dr. Nancollas placed several newspaper ads about their respective practices in the Lewistown Sentinel and other periodicals circulated in Mifflin and Juniata Counties, Pennsylvania. On September 24, 1993, the Geisinger Group placed an ad stating that Dr. Nancollas performed "modern cataract extraction," despite the fact that, at that time, Dr. Nancollas was performing ECCE exclusively. (Pls.Ex. 26.) In another ad, dated August 17, 1995, Geisinger indicated that Dr. Nancollas provided "24 hour local emergency coverage."[10] (Pls.Ex. 43.) These ads also indicated that Dr. Nancollas was a "fully licensed ophthalmologist."[11] (Pls. Exs. 26 and 43.) The August 17th ad ran subsequent to an ad by Dr. Gordon touting his multiple board certifications.

In response to what he perceived as false advertising, Dr. Gordon placed an ad in the Lewistown Sentinel on January 12, 1995. In that ad, Dr. Gordon compared himself to Dr. Nancollas and admonished readers to call the Hospital for information regarding a comparison of complication rates between the two. On January 13, 1995, Whitcomb responded by explaining to Dr. Gordon that he believed release of such information was unlawful and that Dr. Gordon should refrain from making such a recommendation in any future advertisements. The Hospital, however, took no disciplinary action against Dr. Gordon for this advertisement.

Dr. Gordon ran another comparative ad on September 15, 1995. That ad contained the headline "We're confused about some

---

9. *See infra* at Part II.A.2.

10. Dr. Gordon contends that this statement was false. However, he is incorrect. When Dr. Nancollas was unavailable to cover emergency calls, Dr. Kleinert, a Geisinger ophthalmologist in State College, Pennsylvania, would cover Dr. Nancollas' calls.

11. Although this statement also appeared in an advertisement placed during the summer of 1991—before Dr. Nancollas obtained his certification from the American Board of Ophthalmologists—the statement was not false. Dr. Nancollas was licensed as a medical doctor at that time. Possession of a state medical licence is the only prerequisite to practice ophthalmology. The advertisement did not indicate in any way that Dr. Nancollas possessed a board certification. Moreover, as of November of 1991, Dr. Nancollas was certified by the American Board of Ophthalmologists. (*See* Tr. (Nancollas) at 508–509 ("Q: Dr. Nancollas, you are currently Board certified by the American Board of Ophthalmologists correct? A: Yes. Q: You became Board certified in November of 1991? A: Yes.").)

recent advertising." (Pls.Ex. 44.) In the ad, Dr. Gordon criticized "the Geisinger ophthalmologist," pointing out the various benefits of the phaco procedure over "the older procedure." (*Id.*) The ad also stated that "100% of the anesthesiologists at Lewiston Hospital have stated that they would prefer the newer anesthetic technique not yet performed by Geisinger–Lewistown if they were to have cataract surgery." (*Id.*)

Both Geisinger and Dr. Nancollas complained to Whitcomb about Dr. Gordon's advertising campaign. Whitcomb responded that insofar as the September 15th ad referenced the preferences of anesthesiologists at the Hospital, he would forward the matter to the Credentials Committee for investigation as to the statement's truth. However, "the hospital did not feel it appropriate to become involved in a matter between two parties that were external to the hospital if the hospital wasn't implicated in any way." (Tr. (Whitcomb) at 1812.) As a result, the Hospital took no action against Dr. Gordon for this ad, although Whitcomb did express his displeasure to Dr. Gordon regarding the ad's confrontational tone.[12]

The Conditions of Reappointment did not prohibit Dr. Gordon from advertising. Although they did prohibit Dr. Gordon from calling other physician's patients for the purpose commenting about the physi-

cian or his surgical method, neither Condition 2 nor 3 prevented Dr. Gordon from advertising the benefits of *his* surgical method. In fact, Dr. Gordon placed at least two ads in the Lewistown Sentinel— on May 1, 1997 and on September 16, 1997—after the Hospital imposed the Conditions of Reappointment. In the second ad, Dr. Gordon pointed out the increased risks of Dr. Nancollas' procedure without referring to him by name or as "the Geisinger physician." The Hospital took no disciplinary action against Dr. Gordon as a result of these ads.

**6. The Hospital Revokes Dr. Gordon's Privileges.**

a. The June 4, 1997 Letter

On June 4, 1997, Dr. Gordon composed a letter containing a five-paragraph critique of Dr. Nancollas' surgical method. Specifically, the letter complained of the following: (1) the type anesthesia that Dr. Nancollas uses; (2) the longer duration of Dr. Nancollas' procedures; (3) the length of Dr. Nancollas' incision; (4) stroke risks associated with Dr. Nancollas' incision and manner of administering anesthesia; and (5) allegedly unnecessary risks associated with Dr. Nancollas' use of the phacoemulsifier.[13]

Despite Condition 2's requirement that "any complaint or concern about any other member of the Medical–Dental Staff must

---

**12.** In relevant part, the body of this letter reads as follows:

Dear Dr. Gordon:
I am writing to indicate the Hospital's concern and displeasure regarding the continued advertising for which you are responsible in [sic] local media.

. . . . .

*It is recognized that you have the right to place such advertisements and to control the content thereof.*
The general feeling I am expressing at the request of members of our Board is objection to the adversarial and unprofessional

tone prevalent in your advertisement. Members of the Board and others with whom I come in contact are increasingly expressing disappointment that the advertisements seem to be personal in nature, are unprofessional in content, *and seem to be provoking a negative reaction among the general public. There is growing concern that these advertisements reflect poorly on the medical profession in general, on you in particular and on the Hospital as well.*
(Pls. Ex. 173 (emphasis added).)

**13.** By the Spring of 1997, Dr. Nancollas had begun to switch to phaco.

be in writing addressed to either the President of the Medical Staff or the Chairperson of the Credentials Committee, with a copy to the President of the Hospital," Dr. Gordon distributed the letter to over thirty people. (Def.Ex. 227(A)(11).) He mailed the letter to all members of the Board of Trustees, the Credentials Committee, and the entire Administration. The letter was also copied to Phyllis Palm, the Hospital's Senior Vice President, Dr. Edward Ridings, President of the Medical–Dental Staff, Dr. Everhart, and Margaret Dudick, the Operating Room Supervisor. This letter marked the first time that Dr. Gordon had filed a formal written complaint with the Hospital regarding Dr. Nancollas' competency. Because Dr. Gordon had raised a concern regarding the quality of care at the Hospital, the Credentials Committee initiated a quality study of Dr. Nancollas' procedure. The quality study concluded that Dr. Nancollas' procedure fell within the applicable standard of care and did not expose his patients to an unnecessarily elevated risk level. However, that study was limited only to the difference in operating room time used and the amount of energy expended by the phacoemulsifier during Dr. Nancollas' operations.

b. The Margaret Seecora Phone Call

On July 22, 1994, upon a referral from her optometrist, Dr. Gordon examined Margaret Seecora. During this appointment, Dr. Gordon discovered that Seecora had newly-forming cataracts in both eyes. Dr. Gordon told her about the option of cataract surgery, which she declined at that time. Dr. Gordon saw Seecora twice after that, with the last appointment occurring sometime in September of 1994.

During the period from 1995 through 1997, Dr. Gordon's office placed regular calls to Seecora regarding her eye condition. In response to a solicitation from Dr. Gordon's office in August of 1996, Seecora indicated that she was doing well and that she was seeing her eye doctor. In April, 1997, Dr. Gordon's office called Seecora again. She, however, declined to make an appointment, explaining that she was taking care of her condition.

In March of 1997, Dr. Nancollas performed cataract surgery on Seecora. On Sunday June 27, 1997—almost three years after he had last examined her—Dr. Gordon called Seecora at her home. During the course of this conversation, Seecora indicated that Dr. Nancollas had removed one of her cataracts. Dr. Gordon contends he was not aware of this when he called Seecora. Yet, despite Condition 3's pellucid command that Dr. Gordon was not to "call, or otherwise attempt to communicate with, the patients of any other ophthalmologist, or other physician practicing in the Hospital, for the purpose of commenting on the physician's training, skill or competence or the procedure performed by such physician," Dr. Gordon did not terminate the phone call when he learned of Seecora's association with Dr. Nancollas. (Def.Ex. 227(A)(11).) Instead, Dr. Gordon proceeded to take the opportunity to trash Dr. Nancollas to one of his patients. Dr. Gordon told Seecora that "Nancollas was just learning." (Def. Ex. 556 at p. 31.) Dr. Gordon also suggested that Dr. Nancollas had misled Seecora because he "sometimes doesn't tell the whole story." (Def.Ex. 227(E) at ¶ II.B.) Seecora felt intimidated by the phone call. She also felt that Dr. Gordon was trying to solicit her to use him to remove her remaining cataract. On June 30, 1997, Jean Eckley, Seecora's daughter, telephoned Shirley J. Gates, an administrative assistant to Palm. During that conversation, she complained about Dr. Gordon's harassing phone call to her mother.

c. The Hospital's Decision to Revoke Dr. Gordon's Privileges

On July 15, 1997, Dr. Everhart requested that Dr. Gordon meet with the Creden-

tials Committee to discuss the Seecora call and the June 4, 1997 letter. Dr. Gordon and his attorney met with the Credentials Committee on July 17, 1997. The next day, Dr. Everhart wrote a letter to Dr. Gordon, informing him of the Committee's unanimous finding that he had violated paragraphs 2 and 3 of the Conditions of Reappointment. That letter also indicated that, effective July 23, 1997, Dr. Gordon would be excluded from the Hospital, his credentials would be revoked, and he would be ineligible to reapply for privileges for a period of at least five years.

On August 22, 1997, at Dr. Gordon's request, a neutral arbitrator held a hearing to address the Credentials Committee's recommendation. On September 25, 1997, the arbitrator issued a Recommendation and Report affirming the Credential Committee's decision to revoke Dr. Gordon's staff privileges. Dr. Gordon requested appellate review of the arbitrator's decision. On November 24, 1997, the Appellate Review Panel issued a Recommendation and Report agreeing with the arbitrator's conclusions. On November 25, 1997, the Board informed Dr. Gordon that it had adopted the Credentials Committee's recommendation.

### E. *The Hospital's Allegedly Predatory Tactics*

Plaintiffs contend that the Hospital conspired with Dr. Everhart to gag Dr. Gordon and ultimately to revoke his privileges. According to Plaintiffs, the Hospital took this course of action to placate Geisinger, an important business partner of the Hospital who had become incensed by Dr. Gordon's comparative advertising campaign. Additionally, Plaintiffs contend that the Hospital sought to prevent Dr. Gordon from opening an independent outpatient surgical center which would compete with the Hospital in the market for outpatient facilities services and that the

Hospital enlisted Dr. Everhart's assistance in this endeavor.

### 1. The Hospital's Relationship with Geisinger

#### a. The Medical Office Building Lease

Geisinger is a corporation that operates a hospital in Danville, Pennsylvania and employs various physician groups at other hospitals located throughout the Commonwealth through its various managed care health plans. The Geisinger health plans are all closed-panel plans. That is, for Geisinger to reimburse charges that patients incur, a Geisinger physician must treat the patient. Dr. Gordon is not a Geisinger physician and has been denied admission into that panel on numerous occasions.

In 1983, Geisinger and the Hospital began a relationship by adopting an "Understanding of Issue Resolution." That document indicated "that any transaction should benefit all parties involved," and that the Hospital would not take any action to obtain additional physician services without first giving Geisinger the right to respond. (Pls. Ex. 2 at ¶¶ 5 and 12.) It was pursuant to this policy that the Hospital added Dr. Nancollas to the Medical–Dental Staff.

By Fiscal Year ("FY") 1999, Geisinger had become a significant business partner of the Hospital. Geisinger physicians accounted for a substantial share of the Hospital's reimbursement charges. For example, an internal memorandum, generated by the Hospital's administration, indicated that in FY 1999, the Geisinger Health Plan provided 16.9% of the Hospital's total net patient revenue, the largest single private managed care payer of the Hospital's reimbursement charges.

Geisinger was also the largest lessee of space at the Hospital's Medical Office

Building, located adjacent to the Hospital campus. Geisinger paid the Hospital over $400,000 a year for this space. Geisinger could terminate the lease by giving the Hospital six months notice before October 31 of 1992, 1997, or 2002. Absent such notice, the lease would renew for another five-year term.

Dr. Gordon makes much of the fact that the Geisinger lease at the Medical Office building was up for renewal during the same year that the Hospital revoked his privileges. Yet, in contrast to his assertions, each and every member of the Hospital staff who testified at trial indicated that there was no mention of Dr. Gordon or his ongoing conflict with the Hospital at any point during the negotiations of the lease renewal. The court finds these witnesses more credible than Dr. Gordon. *See infra* at Part I.G. Accordingly, the court finds that the relationship between the Hospital and Geisinger played no part in the Hospital's decision to revoke Dr. Gordon's privileges.

b. Efforts to Recruit Other Ophthalmologists

According to Plaintiffs, the Hospital has been successful in its effort to deliver the market for ophthalmological physician services in the relevant geographic market to Geisinger by foreclosing Dr. Gordon from these markets. Plaintiffs aver that the Hospital has assisted Geisinger in maintaining its control of these markets by not recruiting any ophthalmologists to compete with Dr. Nancollas.

However, the Hospital attempted on numerous occasions to recruit an ophthalmologist to replace the vacancy created by Dr. Gordon's exclusion. For example, Gordon McAleer, who replaced Whitcomb as Hospital President, attempted to induce Dr. David Werner and his partner—who practice in State College, Pennsylvania—to apply for staff privileges at the Hospital. They declined the invitation, mainly, because they were aware of the instant litigation and did not want to become embroiled in it.

Palm attempted to recruit Dr. David Ludwick, an ophthalmologist practicing in Harrisburg, Pennsylvania, to apply for staff privileges at the Hospital. Her efforts were successful and in October of 1998, the same month Dr. Gordon opened MCCSC, Dr. Ludwick's application was approved. Dr. Ludwick, however, never treated any patients at the Hospital and did not apply for reappointment when his original privileges expired. McAleer also unsuccessfully attempted to recruit Dr. Louis Betz, an ophthalmologist practicing in Lewisburg, Pennsylvania. Dr. Betz refused the invitation because, among other reasons, he feared Dr. Gordon's litigious nature.

The evidence presented at trial cuts against Dr. Gordon's contention that the Hospital does not wish to recruit a replacement ophthalmologist to compete with Dr. Nancollas. Because the Hospital is located in a fairly remote, rural, sparsely populated area of Pennsylvania, it is not uncommon for it to have only one physician on staff for a particular surgical specialty. There are currently five or six such specialties at the Hospital. More fundamentally, there is no credible evidence that the Hospital has not maintained an open staff—such that any interested and qualified ophthalmologist could apply for staff appointment and clinical privileges—either to placate Geisinger or for any other reason.

2. **Dr. Everhart's Surgical Center**

Various medical surgeries, including cataract surgery, are often performed in either a hospital setting or in a free-standing outpatient surgery center [hereinafter "surgery center" or "surgi-center"]. In

November of 1995, the only outpatient surgical facilities located in Mifflin and Juniata Counties were the Hospital and an outpatient surgery center owned by Dr. Everhart, the Endoscopy Center of Pennsylvania, Inc. ("the Endoscopy Center"). Up until 1996, Pennsylvania law required that, prior to opening a new hospital or outpatient surgical center, the Commonwealth had to issue the owner a "Certificate of Need" ("CON"), indicating that an unfulfilled need existed for additional medical facilities services in the proposed facility's service area. Absent the issuance of a CON, no new medical facilities could be opened.

In November of 1995, the Endoscopy Center, which possessed a CON, was only used to perform outpatient endoscopic procedures. Yet, Dr. Gordon asked Dr. Everhart for permission to perform outpatient cataract surgery at the Endoscopy Center. Dr. Everhart refused. At trial, Dr. Everhart stated several justifications for his decision. First, the Endoscopy Center did not have a CON for ophthalmic surgery. Second, Dr. Everhart's business plans did not include expanding into this area. Third, Dr. Everhart was concerned about Dr. Gordon's litigiousness.[14] Fourth, Dr. Everhart felt that Dr. Gordon mistreated nursing staff and that his presence at the Endoscopy Center would demoralize the staff. The Hospital took no steps to influence Dr. Everhart's decision.

During 1996, Dr. Everhart, the Hospital, and Dr. Gordon all filed CON applications with the Commonwealth. Dr. Everhart sought to expand the Endoscopy Center from a single specialty outpatient surgery center to a multi-specialty surgery center. However, Dr. Everhart was not planning on expanding into ophthalmology. The Hospital itself sought to open its own outpatient surgical center. Finally, Dr. Gor-

don, fed up with what he perceived as unfair limitations on his operating room time and equipment purchases, decided to open his own independent free-standing surgery center.

The Hospital formally opposed Dr. Gordon's application for a CON, arguing that the project would "create[ ] unnecessary operating room capacity...." (Def.Ex. 38.) In addition to its concerns regarding excess capacity, the Hospital also wished to correct false statements Dr. Gordon had made in his CON application regarding the Hospital's operating rooms, equipment, and performance. Dr. Everhart also opposed Dr. Gordon's CON application.

During the course of his application for a CON, the Hospital refused to release any information to third parties regarding Dr. Gordon. However, Dr. Gordon had sued the Hospital previously for releasing confidential peer review materials to third parties. Accordingly, the Hospital refused to release any information regarding Dr. Gordon unless he agreed to sign a form releasing the Hospital from liability arising out of its compliance with information requests from third parties. Dr. Gordon refused to sign the proposed release.

Throughout the summer of 1996, Dr. Everhart and the Hospital engaged in negotiations to form a joint venture to open an outpatient surgery center. Although the parties had prepared a "memorandum of understanding," the negotiations broke down, and no joint venture was ever undertaken. Moreover, Dr. Everhart and Dr. Gordon have never been competitors in either the facilities market or the physician services market. No physician practicing at Dr. Everhart's facility performs any sort of ophthalmic surgical procedures. Thus, Dr. Everhart had no improper motivation to do the Hospital's bidding by im-

---

**14.** By this period of time, Dr. Gordon had sued the Hospital various times. Because he was Chairman of the Credentials Committee, Dr. Everhart was privy to this information.

posing the Conditions of Reappointment or by excluding Dr. Gordon.

Finally, there is no evidence that the Hospital ever pressured or instructed Dr. Everhart to impose the Conditions of Reappointment or to exclude Dr. Gordon from the Hospital. Dr. Gordon has an extensive history of making disparaging, and oftentimes dishonest, remarks about Dr. Nancollas and the nursing staff in inappropriate forums. Dr. Gordon also had a history of making inappropriate contacts with Dr. Nancollas' patients. Thus, Dr. Everhart had ample reasons to impose Conditions 2 and 3. Before signing the Conditions of Reappointment, it was made clear to Dr. Gordon that violation of the Conditions could result in the loss of his privileges to practice at the Hospital. When Dr. Gordon violated the Conditions, Dr. Everhart and the Credentials Committee took reasonable action in response to Dr. Gordon's persistent intransigence. There is absolutely nothing in this record which would indicate that either Dr. Everhart or the Credentials Committee acted inappropriately. The disparate threads of circumstantial evidence to which Dr. Gordon points cannot be woven into a blanket conspiracy. In short, Dr. Gordon has failed to convince the court that a conspiracy existed between Dr. Everhart and the Hospital to exclude Dr. Gordon from the Hospital.[15]

### 3. The Transfer Agreement

In December, 1996, the law requiring the CON expired. Yet, the Pennsylvania Department of Health ("DOH") still required that any physician practicing at a surgery center have staff privileges at a hospital. Additionally, DOH regulations required that surgery centers have a transfer agreement with the closest hospital, in case the need for an emergency transfer to a hospital would be required.

Up through 1998, Dr. Gordon had not received approval for the opening of his proposed surgery center. In a letter, dated August 20, 1998—almost a year after the Hospital had excluded Dr. Gordon— Kathleen John, R.N., a DOH representative, highlighted at least eleven deficiencies revealed during an inspection of the proposed surgi-center site. On October 6, 1998, Nurse John sent another letter to Dr. Gordon regarding a second inspection by DOH personnel. Attached to that letter was a twenty-four page document highlighting deficiencies with the application. DOH required that these deficiencies be remedied before opening the proposed facility. Among these, the DOH noted that Dr. Gordon did not have a transfer agreement with the Hospital, the closest hospital to the proposed site. In response, Dr. Gordon submitted a plan of correction. In that document, Dr. Gordon indicated that he had phoned the Hospital Administration requesting that it issue him a transfer agreement by October 14, 1998. Yet, Palm never received any information regarding any such request, much less a written proposed transfer agreement.[16] Nevertheless, on October 3 or 4, 1998, Nurse John had a meeting with Palm regarding the transfer agreement. Immediately after that meeting, Palm had the Hospital's counsel draw up a proposed agreement on Dr. Gordon's behalf. Both Dr. Gordon and the Hospital signed the transfer agreement on October 16, 1998.[17]

---

15. The existence of an antitrust conspiracy is a question of fact. *See Weiss v. York Hosp.,* 745 F.2d 786, 814 n. 47 (3d Cir.1984) (citations omitted).

16. The court finds that Dr. Gordon was not a credible witness. *See infra* at Part I.G. Ac-

cordingly, the court finds that he never made any such request to Palm.

17. By this date, Dr. Gordon had obtained staff privileges at Holy Spirit Hospital in Camp Hill, Pennsylvania.

By the end of 1998, Dr. Gordon had opened MCCSC, an independent outpatient surgery center. The Hospital did not, in any way, delay the opening of MCCSC. The request for a transfer agreement was not made to the Hospital until early October of 1998, and the Hospital drafted and signed that agreement once the matter was brought to its attention by Nurse John. Additionally, as of that date, Dr. Gordon's application was deficient in several aspects which had absolutely nothing to do with the Hospital.

### 4. Efforts to Discourage Other Physicians from Practicing at MCCSC.

To open a surgery center, it is necessary to have at least one anesthesiologist on staff. Dr. Gordon sought to employ an anesthesiologist practicing at the Hospital to satisfy MCCSC's need. The Hospital, however, had an exclusive contract with all anesthesiologists who had privileges at the Hospital. According to that contract, anesthesiologists practicing at the Hospital were not allowed to practice at any other facility.

As a result, Dr. Gordon had to seek out the assistance of two anesthesiologists practicing in State College: Dr. Denae Powers and Dr. Edward Dench. According to Dr. Powers, Gordon McAleer, who succeeded Whitcomb as Hospital President, approached her at a social event in the summer of 1998, only a few months before Dr. Gordon was set to open MCCSC. During that conversation, McAleer requested that Dr. Powers refrain from practicing at MCCSC because it would be "...detrimental to the Hospital...." (Tr. (Powers) at 374.) When Dr. Powers indicated that, despite McAleer's disapproval, she would be assisting Dr. Gordon, McAleer responded, "... well isn't that the way competition has become, dog eat dog?" (*Id.* at 375.) Other than this isolated comment during a social

event, the Hospital took no other action to discourage Dr. Powers or Dr. Dench from associating with Dr. Gordon and MCCSC. As of the date of trial, both of these physicians practiced at MCCSC.

Additionally, Dr. Yolanda Cillo, an orthopedic surgeon, testified about McAleer's efforts to dissuade her from practicing at MCCSC. Dr. Cillo was employed as a member of a physicians group which the Hospital subsidized in an effort to bring new specialists to the Lewistown area. Dr. Cillo applied for staff privileges at the Hospital on April 1, 2000. Under federal law, the Hospital was prohibited from requiring that Dr. Cillo practice exclusively at the Hospital. On July 25, 2000, less than four months after applying for privileges to practice at the Hospital, Dr. Cillo applied for privileges at MCCSC.

In August of 2000, almost two years after MCCSC opened, McAleer approached Dr. Cillo to discuss whether she planned to work at MCCSC. She indicated that she did. McAleer then attempted to dissuade her from associating herself with Dr. Gordon. He also indicated, however, that he was powerless to prevent her from doing so. Dr. Cillo subsequently began to treat patients at MCCSC. At some point thereafter, an article about Dr. Gordon's surgery center appeared in a local paper. The article apparently mentioned that Dr. Cillo was treating patients at MCCSC. McAleer then called Dr. Cillo for an explanation as to why she was practicing at MCCSC. According to Dr. Cillo, McAleer "... was quite angry, very livid in fact, as to why my name was in that because he thought we had an understanding...." (Tr. (Cillo) at 363.) After that conversation, Dr. Cillo ceased performing surgery at MCCSC.

McAleer, however, never ordered Dr. Cillo to stop practicing at MCCSC. Additionally, he took no adverse action against

Dr. Cillo to punish her for practicing at MCCSC. In late May of 2001, Dr. Cillo stopped practicing at the Hospital and then left the central Pennsylvania area for personal reasons.

## F. *Relevant Antitrust Markets*

The following constitute the relevant product markets in this case: (1) outpatient cataract facility services; (2) outpatient cataract physician services; (3) facility services for inpatient eye surgery; (4) facility services for emergency eye surgery; (5) physician services for inpatient eye surgery; and (6) physician services for emergency eye surgery. These are essentially three sets of complementary product markets. Because the product markets are complementary, their geographic market should be identical.

The geographic scope of the markets for outpatient cataract surgery services consist of all hospitals and surgical centers performing outpatient cataract surgery which are located within thirty miles of Lewistown. The geographic scope of the markets for inpatient eye surgery services consist of all hospitals located within fifty miles of Lewistown. The Hospital does not possess market power in either the outpatient cataract surgery facility services market or the market for inpatient eye surgery facility services.

The geographic scope of the markets for emergency eye surgery services consist of Mifflin and Juniata Counties. The Hospital is the only provider of emergency eye surgery facility services in this area. Therefore, it possesses market power in this antitrust market.[18] The Hospital's actions did not cause anti-competitive effects in any of the relevant antitrust markets in this case.[19]

## G. *Dr. Gordon's Credibility*

Dr. Gordon was not a credible witness regarding either his conduct or the Hospital's reaction to it. Dr. Gordon made a material misstatement of fact on his August 15, 1999 application for re-certification to the American Board of Eye Surgery. In that document, Dr. Gordon was asked, "Have your privileges at any hospital or surgical facility been restricted, suspended, withdrawn, or not renewed at any time during the past ten years?" (Def. Ex. 501 at p. 3.) Dr. Gordon replied "Yes." (*Id.*) However, when asked to explain the circumstances and final result of such disciplinary action, Dr. Gordon stated only that he "move [sic] to surgery center." (*Id.*) Dr. Gordon's abrupt characterization of his extensive history of disciplinary problems at the Hospital differs greatly from the reality of the situation. Put bluntly, Dr. Gordon did not merely move from the Hospital to a surgery center. Rather, he was expelled from the Hospital after three suspensions and a violation of his conditional reappointment. His failure to explain this history in any relevant detail indicates an unwillingness to be truthful about his long history with the Hospital. Moreover, the application also asked Dr. Gordon whether "any disciplinary action [has] been taken [against you] by . . . [a] hospital or surgery facility, or any other ethics, grievance, quality review and/or professional conduct committee at any time during the past ten years?" (*Id.*) Dr. Gordon replied, "No." (*Id.*) This constitutes a lie and further bolsters the conclusion that Dr. Gordon is unwilling to tell the truth about the Hospital's disciplinary action against him.

Additionally, during trial, evidence was presented indicating the true motivation for the instant action—Dr. Gordon's de-

---

**18.** For an in depth analysis of the market power issue, see *infra* at Part II.A.1.b.

**19.** For an in depth analysis of anti-competitive effects, see *infra* at Part II.A.1.c.

sire to ruin the Hospital by dragging it through protracted and expensive litigation. In this respect, Dr. Ridings, the current President of the Hospital's Medical–Dental Staff, testified at trial:

> Q: Dr. Ridings, has Dr. Gordon made statements to you regarding his desire and goals with respect to the Lewistown Hospital?
>
> A: Yes, he has.
>
> Q: And what has he said to you, sir?
>
> A: He has told me several times when we were still friendly that his only goal regarding Lewistown Hospital was to cause it to fail and fold and close.

(Tr. (Ridings) Vol 12 at 213.)

Finally, Dr. Gordon's disruptive conduct after his termination is consistent with this goal. For example, the Hospital's Medical–Dental Staff held an off-premises meeting at a local hotel sometime during the latter part of 2001, over four years after the Hospital revoked Dr. Gordon's staff privileges. Although he was not invited because he was not a member of the Medical–Dental Staff, Dr. Gordon showed up at the meeting. He walked in while McAleer was giving a speech. When McAleer finished his speech, Dr. Wooten, who was running the meeting asked Dr. Gordon if he would leave because he had not been invited to the meeting. Dr. Gordon refused to leave. Thereafter, Dr. Ridings requested that all invitees who wanted Dr. Gordon to leave to stand up. Upon Dr. Ridings' request, all invitees stood. Dr. Gordon insisted that he would not leave. As a result, Dr. Ridings adjourned the meeting, and the entire staff left.

Dr. Gordon has a personal problem with the Hospital and the way he feels they have treated him. As a result, he has demonstrated a willingness to lie about his disciplinary history with the Hospital, a desire to cause the Hospital to fail financially, and a need to disrupt the Hospital's operation when the opportunity presents

itself. As a result, Dr. Gordon's testimony regarding his behavior, and the Hospital's reaction to it, cannot be trusted.

### H. *Procedural History*

On June 25, 1999, Plaintiffs filed the instant suit against the Hospital and various other entities. On February 2, 2000, Plaintiffs filed an amended complaint against the Hospital only, alleging violations of Sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. §§ 1 and 2. Plaintiffs' amended complaint stated eight causes of action under the Sherman Act. In that document, Plaintiffs alleged five Section 1 causes of action: a contract in restraint of trade (Count I); illegal tying arrangement (Count II); reciprocal dealing (Count IV); boycott (Count V); and exclusive dealing (Count VI). Plaintiffs also alleged three Section 2 claims: attempted monopolization (Count III); and two claims for conspiracy to monopolize (Counts VII and VIII).

After the expiration of the discovery period, the parties filed cross-motions for summary judgment. On May 21, 2001, the court granted summary judgment in favor of Defendants as to Counts I, IV, V, VII, and VIII, setting up a trial on Counts II and III. The parties then filed cross-motions for partial reconsideration of the court's order of May 21, 2001. On August 15, 2001, the court granted in part Plaintiffs' motion for partial reconsideration. Specifically, the court held that it had erroneously included Count I in the list of claims on which the court granted summary judgment in favor of the Hospital. The court also granted in part the Hospital's motion for partial reconsideration, holding that because Plaintiffs' remaining claims against the Hospital arose out of peer review decisions, those claims would not support an award of monetary damages against the Hospital pursuant to the

Health Care Quality Immunity Act. *See* 42 U.S.C. §§ 11101(5) and 11111(a).

Accordingly, the only issues left for trial were Counts I, II, and III. Additionally, if the court were to find that the Hospital violated the Sherman Act, the court would also have to determine whether Dr. Gordon was entitled to injunctive relief; principally reinstatement of his privilege to practice at the Hospital.

## II. *Discussion*

### A. *Count I: Unreasonable Restraint on Trade*

In Count I of the amended complaint, Plaintiffs aver that:

> The Hospital engaged in various contracts, combinations and conspiracies . . . whereby Dr. Gordon was required to enter into a November, 1996 gag contract that prevented Dr. Gordon from communicating truthful non-deceptive information to patients relevant to their surgical decisions, including their choice of ophthalmologist, foreclosed Dr. Gordon from supplying services in the relevant physician opthalmic [sic] surgical markets, and created an unreasonable restraint of trade, all in violation of Section 1 of the Sherman [Act], 15 U.S.C. § 1.

(Amend. Compl. at ¶ 47.)

■ Section 1 of the Sherman Act (hereinafter "Section 1") provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states . . . is declared to be illegal." 15 U.S.C. § 1. In spite of its sweeping language, courts have long held that literal application of Section 1 would render virtually every business arrangement unlawful. *See, e.g., Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."). Because even beneficial restraints on trade would be prohibited by a literal interpretation of Section 1, that provision has been interpreted as applying only to those contracts or combinations which are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

Relying on Supreme Court case law, the Third Circuit has enumerated three different tests to determine whether a business contract, combination, or conspiracy constitutes an unreasonable restraint on trade in violation of Section 1:(1) the traditional rule of reason test; (2) the *per se* test; and (3) the quick look rule of reason test. *See United States v. Brown Univ.*, 5 F.3d 658, 668–69 (3d Cir.1993). In its memorandum regarding the parties' cross-motions for summary judgment, the court held that the appropriate standard for evaluating the Section 1 claim in this case is the traditional rule of reason test. *See Gordon v. Lewistown Hosp.*, No.1:CV–99–1100, slip op. at 20–21 (M.D.Pa. May 21, 2001) (citing *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir.1996) ("The Supreme Court has instructed that vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason."); *Parikh v. Franklin Med. Ctr.*, 940 F.Supp. 395, 401 (D.Mass. 1996) ("Given the potential harms and benefits to competition flowing from vertical agreements . . . courts generally apply a rule of reason in deciding whether a particular agreement violates § 1 of the Sherman Act. . . ."); *MHB Distribs., Inc. v. Parker Hannifin Corp.*, 800 F.Supp. 1265, 1268 (E.D.Pa.1992) ("The appropriate standard for reviewing vertical non-price restraints is rule of reason.")).

■ Pursuant to the traditional rule of reason test, "[t]he plaintiff bears an

initial burden ... of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." *Brown Univ.*, 5 F.3d at 668. However, because proof of actual anti-competitive effects is often impossible to make—due to the difficulty of isolating the market effects of challenged conduct—courts allow a plaintiff to present proof of the defendant's market power to satisfy its initial burden. *Id.* (citing *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir.1991); and 7 P. Areeda, *Antitrust Law* ¶ 1503, at 376 (1986)).

■ Once a plaintiff has successfully met its initial burden under the traditional rule of reason, the burden then shifts to the defendant to "show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. If the defendant carries this burden, the plaintiff must prove that the "restraint is not necessary to achieve the stated objective." *Id.* "[T]he finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). In sum, under the rule of reason "the test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade*, 246 U.S. at 238, 38 S.Ct. 242; *see also Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 82 (3d Cir.1977) ("The ultimate test of legality, of course, is whether the particular restraint promotes or impairs competition.").

### 1. Plaintiffs' Initial Burden

Essentially, Plaintiffs allege that the Hospital imposed the Conditions of Reappointment on Dr. Gordon and then excluded him from the Hospital in an effort to placate Geisinger. According to Plaintiffs, these actions constituted unreasonable restraints on trade in that they unreasonably restrained, and ultimately foreclosed, Dr. Gordon from competing in the physician services markets for outpatient cataract surgery, inpatient eye surgery, and emergency eye surgery. Additionally, Plaintiffs contend that the Hospital sought to prevent MCCSC from competing with it in the facility services market for outpatient cataract surgery.

■ To meet their initial burden, Plaintiffs must prove the following: (1) concerted action; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that it proximately caused an injury to Plaintiffs. *See Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996) (quoting *Petruzzi's IGA Supermkts., Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.1993)). As stated previously, instead of proving an actual anticompetitive effect, a plaintiff may satisfy its initial burden by proving market power in the relevant product and geographic markets because market power is essentially a "surrogate for detrimental effects." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (citation omitted). For the reasons stated below, the court finds that Plaintiffs have failed to satisfy their initial burden with respect to all relevant antitrust markets except for the market for emergency eye surgery facility services.

#### a. Concerted Action

"The very essence of a section 1 claim, of course, is the existence of an agree-

ment." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994). For a Section 1 claim to be valid, "a plaintiff must prove 'concerted action,' a collective reference to the 'contract . . . combination or conspiracy.'" *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1131 (3d Cir.1995) (quoting *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992)). "Unilateral action, no matter its motivation, cannot violate [Section] 1." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir.1980).

Plaintiffs contend that they established concerted action in two independent ways: (1) through the Conditions of Reappointment themselves; and (2) through the alleged conspiracy between the Hospital and Dr. Everhart. In contrast, the Hospital contends that the Conditions of Reappointment fall outside the purview of the Sherman Act because Dr. Gordon voluntarily agreed to them and Plaintiffs failed to establish the existence of a conspiracy between Dr. Everhart and the Hospital. Finally, the Hospital argues that the court should preclude Plaintiffs from alleging such a conspiracy because they did not mention it in their amended complaint.

i. The Conditions of Reappointment

■ According to the Hospital, "[t]he Conditions of Reappointment, voluntarily entered into between Plaintiff and Defendant are contractual requirements of which Plaintiff was fully aware and agreed to prior to signing the Conditions of Reappointment. As such these contractual issues are not within the purview of the antitrust laws." (Def. Prop. Conclusions of Law at ¶ 4.)

In support of this argument, the Hospital relies primarily on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997). In that case, the Third Circuit upheld the district court's order granting Domino's motion to dismiss the plaintiffs-franchisees' claims under Section 1 for monopolization, exclusive dealing, and tying. *See id.* at 444. The court held that the plaintiffs' allegation that Domino's had market power over the "market for ingredients, supplies, materials, and distribution services used in the operation of Domino's stores" failed as a matter of law because the plaintiffs had failed to allege a proper product market. *Id.* at 437, 441. The plaintiffs argued that because Domino's franchise agreement required franchisees to use only Domino's-approved products in their stores, the relevant product market was Domino's-approved products and supplies necessary to run a Domino's franchise. The plaintiffs contended that such an agreement fell within the secondary market doctrine announced by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). In *Kodak*, the defendant forced its customers to obtain service from Kodak for their already-purchased Kodak copiers, thus establishing a secondary market of captive consumers. In rejecting the Domino's franchisees' argument that the Domino's franchise agreement established a secondary market of captive consumers, the Third Circuit distinguished the situation from *Kodak*, in part, based on the fact that the plaintiffs in *Queen City* voluntarily entered into the contract with Domino's fully aware that Domino's would require it to purchase supplies and materials from it.

*Kodak* is distinguishable from the present appeal in other important respects. The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies. When the copiers were first sold, Kodak relied on purchasers to obtain service from independent service providers. Later, it chose to use its power over the market in unique replacement parts to squeeze

the independent service providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher cost. Because this change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision. In contrast, plaintiffs here knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement. Unlike the plaintiffs in *Kodak*, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage. That cannot be said of the conduct challenged in *Kodak* because it was not authorized by contract terms disclosed at the time of the original transaction. Kodak's sale of its product involved no contractual framework for continuing relations with the purchaser. But a franchise agreement regulating supplies, inspections, and quality standards structures an ongoing relationship between franchisor and franchisee designed to maintain good will. These differences between the *Kodak* transaction and franchise transactions are compelling.

*Queen City Pizza,* 124 F.3d at 440.

■ As this review of *Queen City Pizza* reveals, the court's holding in that case had nothing to do with concerted action. The court did not hold, as the Hospital apparently contends, that voluntary contracts do not constitute concerted action for Section 1 purposes. Moreover, such a holding would stand in stark contrast to long-standing antitrust precedent holding that contracts entered into between parties of unequal bargaining position, *i.e.* vertical arrangements, are subject to antitrust scrutiny. *See, e.g., Albrecht v. Herald Co.,* 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) ("[Section 1] covers combinations in addition to contracts and conspiracies, express or implied.") (citing *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)) *overruled on other grounds by State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (holding that vertical maximum price fixing not subject to *per se* analysis under Section 1 of the Sherman Act). Because the Conditions of Reappointment constituted a contract, the decision to impose them qualifies as concerted action. Therefore, the court finds that Plaintiffs' have satisfied their burden of proving this element.

ii. The Alleged Conspiracy with Dr. Everhart

■ Additionally, Plaintiffs claim that they established the existence of a conspiracy between the Hospital and Dr. Everhart, its competitor in the outpatient facilities market, which satisfies the concerted action requirement. The Hospital argues that Plaintiffs' claim regarding the alleged conspiracy between Dr. Everhart and the Hospital fails for two reasons. First, the evidence was factually insufficient to support a holding that such a conspiracy existed. Second, Plaintiffs failed to properly allege this conspiracy in their amended complaint.

The court holds that the Hospital's relationship with Dr. Everhart does not satisfy the concerted action requirement of a Section 1 claim. As the court has stated above, Plaintiffs have not convinced the court that such a conspiracy existed. *See supra* at Part I.E.2. Plaintiffs, however, apparently contend that because the existence of the ultimately-unsuccessful joint venture arrangement between the Hospital and Dr. Everhart is undisputed, they have

met their burden and are not required to prove that either the Hospital or Dr. Everhart coerced the peer review process to injure Dr. Gordon. (See Pls. Supp. Proposed Findings of Fact at ¶ 13 ("Moreover, the Hospital's coercion of Dr. Everhart is irrelevant.").)

In *Mathews v. Lancaster General Hospital*, however, the Third Circuit stated that "[w]here a hospital board has ultimate decision making authority, '[s]imply making a peer review recommendation does not prove the existence of a conspiracy [among the hospital and its staff]'; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendations." 87 F.3d at 639 (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir.1991)). Of course, the converse of that statement is true as well. That is, where it is the hospital that has allegedly manipulated the peer review process, there must be some evidence of coercion. In this respect, Plaintiffs presented evidence that Dr. Everhart and the Hospital were contemplating a joint venture at approximately the same time that the Hospital was in the process of imposing the Conditions of Reappointment on Dr. Gordon. While "a contractual relationship might support an inference" of coercion, the court does not find that coercion occurred in this case. *Id.* at 640. Given that the compelling evidence in this case vindicates the reasonableness of the Credentials Committee's actions, regardless of

their antitrust consequences, the court will not impute an anti-competitive motive to Dr. Everhart's conduct.[20] In short, there is no compelling evidence indicating that Dr. Everhart or the Hospital manipulated the peer review process at all, much less to injure Dr. Gordon or competition among physicians. Thus, the court finds that Plaintiffs have failed to prove concerted action between Dr. Everhart and the Hospital. Because the court finds that Plaintiffs failed to meet their burden as to this point, the court need not address the Hospital's argument regarding the deficiency of Plaintiffs' amended complaint in this regard.

### b. Market Power

As stated above, a plaintiff in an action brought under Section 1 of the Sherman Act may establish its initial burden of demonstrating that the concerted action actually caused anti-competitive effects. *See supra* at Part II.A.1. However, because "[s]uch proof is often impossible to make ... courts typically allow proof of the defendant's 'market power' instead." *Brown Univ.*, 5 F.3d at 668 (citations omitted).[21]

■■■■ "As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). It "is essentially a 'surrogate for detrimental effects.'" *Brown Univ.*, 5 F.3d at 668

**20.** To the extent that Plaintiffs claim that the agreement between Dr. Everhart and the Hospital, which provided that Dr. Everhart's surgery center would not compete with the Hospital in providing a facility for outpatient cataract surgery, constitutes an impermissible market allocation agreement, the court finds that this agreement did not proximately cause Dr. Gordon's alleged injury. Dr. Gordon's conduct caused the imposition of the Conditions of Reappointment and his ultimate exclusion. *See Petruzzi's IGA Supermkts.*, 998

F.2d at ·1229 (holding that to satisfy initial burden under rule of reason analysis, the plaintiff must establish not only concerted action, but also that the concerted action proximately caused the plaintiff's injury).

**21.** Likewise, to establish a Section 1 illegal tying claim, the plaintiff may satisfy its burden by demonstrating that the defendant possessed market power. *See infra* at Parts II. B.1.

(quoting *Indiana Federation of Dentists*, 476 U.S. at 460–61, 106 S.Ct. 2009).[22] The existence of market power is a question of fact. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir.1992); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir.1984). A plaintiff bears the "affirmative duty of proving the relevant product and geographic markets affected by the defendants' alleged uncompetitive activity." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 147 n. 4 (3d Cir.2001) (citing *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996) (holding that the plaintiff must present evidence from which a rational person could conclude that the relevant markets are what the plaintiff alleges them to be)).

Defining the relevant product and geographic markets is the first step in an analysis of whether a particular firm possesses market power. *See Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 513 (3d Cir.1998) (stating that antitrust markets have two components: product and geographic); (*see also* Tr. (Gaynor) at 1287 ("First step is define the product market, define the geographic market.").) Once the relevant product and geographic markets have been defined, the court must determine if the defendant's market share

is sufficient for the court to infer the existence of market power or if other relevant factors—such as the strength of competitors or barriers to entry of competitors—are sufficient for the court to infer market power. *See Fineman*, 980 F.2d at 201–02.

### i. Product Market

" 'Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.' " *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir.1993) (quoting *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987) (internal quotation omitted)); *accord SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.1978). Plaintiffs claim there are four separate product markets[23] at issue in this case: (1) facility services for inpatient eye surgery; (2) facility services for outpatient cataract surgery in a hospital setting; (3) facility services for outpatient cataract surgery in either a hospital or a free-standing surgery center (also referred to as "general cataract facility services"); and (4) facility services for emergency eye surgery.[24]

---

**22.** Alternatively, market power also exists if a firm can profitably maintain lower product or service quality, at the same price, for a significant period of time. (*See* Tr. (Harris) at 2335 (stating that market power also refers to the ability to lower quality, but emphasizing that "it must be profitable. Anyone could set a price higher than the competitive level, but if no [sic] comes to you, then it is not an exercise of market power. That is a bad business decision.").)

**23.** Based on testimony provided by Plaintiffs' expert, Dr. Martin Gaynor, it appears that Plaintiffs are alleging that several of these markets are actually submarkets of other broader markets. (*See* Tr. (Gaynor) at 1302.). However, this is a distinction without a difference. Antitrust law treats markets and sub-

markets the same way. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n. 42, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("[W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."). While it is important for the court to determine what exactly are the distinct markets at issue in this case, it does not matter whether those markets are termed markets themselves or whether they are submarkets of each other. Therefore, to avoid confusion, the court will refrain from using the term submarket. *But see infra* at fn. 28.

**24.** Plaintiffs also contend that there are four additional physician services markets at issue in this case which correspond to the complimentary facility services markets: (1) outpa-

The Hospital, on the other hand, contends that there are fewer markets than Plaintiffs allege. Specifically, the Hospital contends that there is only one market relevant to outpatient cataract surgery.[25] That is, there is no separate market for outpatient cataract surgery performed in a hospital setting.

■ "The outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable by consumers for the same purpose." *Brokerage Concepts,* 140 F.3d at 513. " 'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Allen–Myland, Inc. v. International Business Machines Corp.,* 33 F.3d 194, 206 (3d Cir.1994) (internal quotations omitted). "When assessing reasonable interchangeability, '[f]actors to be considered include price, use, and qualities.' " *Queen City Pizza,* 124 F.3d at 437 (quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d at 726).

Thus, with respect to the relevant product markets, the issue is whether outpatient cataract surgery performed in a free-standing surgery center is reasonably interchangeable with, or substitutable for, outpatient cataract surgery in a hospital. If the two services are reasonably interchangeable, then they are part of the same product market. If not, they each constitute their own product market.

There are, of course, certain patients for whom outpatient cataract surgery in a free-standing surgery center is impossible. For example, Dr. Martin Gaynor, one of Plaintiffs' economic experts testified that, by regulation, children and people requiring general anesthesia may not be treated in a free-standing surgery center. (*See* Tr. (Gaynor) at 1295.)[26] Also, there are other patients whose physicians require that they receive outpatient surgery in a hospital setting as a matter of medical prudence. However, it is undisputed that these types of patients are exceptional. As a result, their need to have outpatient cataract surgery in a hospital setting is not demonstrative of general patient preference, which is the cornerstone of any

tient cataract physician services in a hospital setting; (2) outpatient cataract physician services in either a hospital or a free-standing surgery center; (3) inpatient eye surgery physician services; and (4) emergency eye surgery physician services. The Hospital, however, is not a participant in the physician services aspects of these markets and, therefore, cannot possess market power in those markets. Moreover, Plaintiffs allegation is that the Hospital leveraged its power in the facility services markets to cause competitive injury in the physician services and facility services markets. Thus, whether the physician services markets are sufficiently well defined is irrelevant to our purposes. The court, therefore, will not discuss these markets in its analysis of market power. However, because these markets are complimentary that is, for each facility services markets there is a corresponding physician services market—any holding regarding the appropriate facility services market would pertain equally to the corresponding physician services market. This is a result of the very nature of eye treatment. Patients will only purchase a facility service along with the corresponding physician service. That is, patients undergoing eye treatment need both a facility in which they can be treated and a physician who will treat them.

**25.** The Hospital argues that Plaintiffs have failed to prove several of the other markets as well. However, those objections pertain to the geographic scope of those markets. Those objections are discussed below. *See infra* at Part II.A.1.b.ii.

**26.** Although children may not undergo surgery in a free-standing surgery center, it is beyond dispute that the overwhelming majority of cataract surgery patients are elderly.

sound definition of a product market. (*See* Tr. (Gaynor) at 1296 ("A: ... But in general, economics says that product markets are determined by what consumers consider to be practical alternatives or substitutes. Q: Does the issue of consumer taste go to the issue of practical alternatives? A: Precisely.")); *see also, Queen City Pizza*, 124 F.3d at 438 ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956))).

At trial, Dr. Gaynor concluded that his study of consumer preference indicated that separate markets exist for outpatient cataract surgery in a hospital setting and general outpatient cataract surgery in either a hospital or a free-standing surgery center. He based his conclusion on patient migration and price data. As he testified,

> The idea that motivated this analysis goes as follows: If there are people that either strongly prefer to be treated in a hospital setting ... then if we look where there are both hospitals and free-standing surgery centers treating cataract surgeries, and we look at places where the price for the hospital is higher than for the free-standing surgery center, and if a substantial number of people still go to the hospital, then it would indicate to me that there are people who ... have very strong preferences to be treated in a hospital setting....
>
> . . . . .
>
> So what I did is the following: I identified all the cities in Pennsylvania that had at least one free-standing surgery center doing cataract surgery and at least one hospital doing cataract surgery, and for which the charges for the

hospital were higher than the charges for the facility....

> . . . . .
>
> And in half of those cities, 46 percent of the cataract surgery patient[s] go to a hospital, and 54 percent go to a free-standing facility. So in spite of the fact that there are alternatives, both in the same city and one of them has a much higher price, there are a very substantial number of patients who still choose to go to a hospital.
>
> And that is consistent with the notion that there exists a separate product market for hospital cataract—hospital outpatient cataract surgery.

(*Id.* at 1297–98.)

The phenomenon whereby a price increase of a good in a particular market would tend to create greater demand for goods in other markets is what is often referred to as "cross-elasticity of demand." *See, e.g., Tunis Bros.*, 952 F.2d at 722. Taken at face value, Dr. Gaynor's study indicates a lack of cross-elasticity of demand between the markets for general outpatient cataract surgery and outpatient cataract surgery in a hospital setting. If the court were to accept this argument, then it would be forced to conclude that there are separate markets for these services.

Dr. Gaynor's price-based analysis, however, does not accurately portray whether outpatient cataract surgery in a free-standing surgery center is reasonably interchangeable with outpatient cataract surgery in a hospital. First, price is not an accurate measure of consumer preference in the field of medicine because a majority of the costs incurred are paid by third-party payers such as private insurance companies and Medicare. (*See* Pls. Proposed Findings of Fact at ¶ 35 ("Like all physicians, cataract surgeons compete on many dimensions other than price, including innovation, product variety and prod-

uct quality. Indeed, because most of the cost of surgery is born by third-party payers, the most meaningful competition among surgeons is on the basis of quality and patient preference [for surgical method or physician].")); *see also FTC v. Tenet Health Care Corp.,* 186 F.3d 1045, 1054 (8th Cir.1999) ("As the district court noted, healthcare decisions are based on factors other than price."); *Urdinaran v. Aarons,* 115 F.Supp.2d 484, 489 (D.N.J.2000) ("Because medical fees are largely dictated by health insurance companies, Medicaid, and Medicare, courts have looked at . . . indicia [other than price] of anticompetitiveness, such as quality of care, which is often determinative for consumers of medical services."). Without evidence that third-party payers would steer their patient's choices based on the price of the facility where the procedure is performed, Dr. Gaynor's study does not validly demonstrate a consumer recognition of distinct markets for facility and physician services for outpatient cataract surgery in a hospital setting. *But see FTC v. Freeman Hosp.,* 69 F.3d 260, 270 n. 14 (8th Cir.1995) (holding that evidence indicating that third-party payers would only steer patients elsewhere in reaction to a 15 to 20% increase "should be given some weight, since the terms of managed care and third-party insurance contracts necessarily have some bearing on where patients can practicably turn for their health care.").

Second, outpatient cataract surgery in a surgical center is functionally equivalent to outpatient cataract surgery in a hospital setting. A physician will perform the exact same procedure in both settings, and the patient will receive the same result.

Neither the surgical method employed, nor the outcome of the surgery, depends on the facility in which it is performed. (*See* Tr. (Burns) at 2132 ("Q: Dr. Burns have you ever hesitated to offer Dr. Gordon as an option to one of your patients for cataract surgery because of the fact that he performs surgery in a surgicenter as opposed to a hospital? A: No.").)

■ Based on the foregoing, the court will not accept Dr. Gaynor's conclusion that there are separate markets for outpatient cataract surgery performed in a hospital setting and general outpatient cataract surgery. The truth is, except for the very limited class of patients who cannot be treated in a surgery center or whose physicians would counsel against it, the use and quality of the outpatient cataract surgery are the same regardless of the type of facility in which it is performed. As a result, suppliers of outpatient cataract facility services in a free-standing surgery center are effective competitors with suppliers of outpatient cataract facility services in a hospital setting.[27]

The evidence presented at trial supports this conclusion. For example, in 1999—the first full calendar year that MCCSC was open—Dr. Gordon performed 945 "Gordon/Nancollas" procedures for patients residing in the Hospital's primary service area, all at a free-standing surgery center. That same year, Dr. Nancollas performed only 162 such procedures, all at the Hospital. (Def.Ex. 547, Ex. 18.)[28] Such a staggering contrast in the output between these competitors sharply contradicts Plaintiffs' contention that consumer preference indicates that distinct markets

---

27. The same holds true in the proposed complementary markets for physician services.

28. Although these numbers include other forms of outpatient ophthalmic surgery, outpatient cataract surgery accounted for over 95% of these procedures. (*See* Tr. (Harris) at

2346 ("I looked at what I call Gordon/Nancollas procedures. And that was the set of procedures performed by Dr. Gordon and Dr. Nancollas. It was overwhelmingly in excess of 95 percent cataracts, but it included a few other procedures as well.").)

exist for outpatient cataract surgery performed in a hospital setting. Instead, this evidence indicates that patient preference is driven much more by quality concerns—affinity for a particular physician or a desire to have a particular surgical method used—than by the setting in which the surgery is performed.[29] The evidence did not indicate that patients differentiate outpatient cataract surgery performed in a free-standing surgery center from the same procedure performed in a hospital setting.[30]

Another of Plaintiffs' experts, Dr. William Vogt, Ph.D., testified that the number of patients Dr. Gordon treated after opening MCCSC was 29 % lower than the number of patients that Dr. Vogt had predicted, using population and demographic data, Dr. Gordon should have treated. According to Plaintiffs, this demonstrates that a separate market for hospital-based outpatient cataract surgery existed. However, this demonstrates only that Dr. Gordon may have suffered an economic injury as a result of his exclusion from the Hospi-

tal, not that a separate product market exists for outpatient cataract surgery performed in a hospital setting. Because antitrust law is concerned with injury to competition, not competitors, such information is of limited assistance in defining the relevant product markets. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d at 641 (" 'An antitrust plaintiff must prove that challenged conduct affected price, quantity or quality of goods or services,' not just his own welfare." (quoting *Tunis Bros.*, 952 F.2d at 728)). Thus, Dr. Vogt's statistics regarding injury to a competitor within a narrowly-defined geographic market bears little on the question of whether outpatient cataract surgery in a hospital setting or a free-standing surgery center are functionally equivalent. Even if the court were to accept Dr. Vogt's statistical analysis, alone, this would not convince the court that a separate market exists for outpatient cataract surgery performed in a hospital setting, given the extensive information indicating that the two settings are functional equivalents. *See supra.*

---

**29.** Although Dr. Gaynor testified at trial that the disparity between Dr. Gordon's procedures and Dr. Nancollas' procedures in 1999 resulted from the release of pent-up demand, this tends to further undercut Dr. Gaynor's conclusion regarding consumer preference. The pent-up demand resulted because patients viewed Dr. Gordon as a better surgeon than Dr. Nancollas. This confirms that quality, not setting, is what truly drives consumer choice in the context of outpatient cataract surgery facility and physician services.

**30.** As a brief matter of clarification, outpatient cataract facility services in a hospital setting would likewise not qualify as a distinct submarket of the general market for outpatient cataract facility services. First, there is no industry recognition of these services as constituting separate economic entities from the general market for outpatient cataract surgery facility services. Second, there is no peculiar characteristic of outpatient cataract surgery performed in a hospital setting. Third, there are virtually no specialized ven-

dors who exclusively market themselves as providing facility services for outpatient cataract surgery in a hospital setting. Fourth, while there are distinct prices for such services depending on whether they are performed in a hospital or a free-standing surgery center, price is not relevant where, as here, the cost is usually borne by third party payers and not consumers. Fifth, for the same reason, there is little to no sensitivity to price changes. Sixth, a hospital setting is not a unique production facility because the same result can be obtained if the surgery is performed in a free-standing surgery center. Seventh, there are some distinct customers who must, or should, undergo outpatient cataract surgery in a hospital setting. However, the number of these patients is so small that they are not a reliable indicator of consumer preference. *See Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. 1502 (listing seven factors in determining whether a submarket exists). The same holds true for the complimentary physician services market.

In summation, the court finds that there is only one general market for outpatient cataract surgery facility services, as opposed to the separate markets—espoused by Plaintiffs—for outpatient cataract surgery generally and outpatient cataract surgery performed in a hospital setting. Additionally, there are two other relevant product markets at issue in this case: facility services for inpatient eye surgery; and facility services for emergency eye surgery.

ii. Geographic Markets and Market Share

■ Having determined the relevant product markets, the court must now determine, for each of these markets, whether Plaintiffs have satisfied their burden of establishing the geographic scope of these product markets, as well as the Hospital's share. "The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks...." *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir.1984) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); *accord Surgical Care Ctr. v. Hospital Serv. Dist.*, 309 F.3d 836, 840 (5th Cir.2002) (quoting *Doctor's Hosp. of Jefferson v. Southeast Med. Alliance*, 123 F.3d 301, 311(5th Cir.1997)); *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir.1982) (quoting *Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 918 (8th Cir.1976)). "The relevant ... geographic market must reflect the realities of competition." *Doctor's Hosp.*, 123 F.3d at 311; *accord Oksanen v. Page Mem'l Hosp.*, 945 F.2d at 709. The geographic scope of a relevant product market is a question of fact and is "to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." *Borough of Lansdale*, 692 F.2d at 311 (citing 2 E. Kintner, Federal Antitrust Law § 12.4 (1980)). Determining the breadth of the geographic market is important because it establishes the area in which the court will calculate the defendant's market share in the relevant product market(s). *See Miller v. Indiana Hosp.*, 814 F.Supp. 1254, 1262 (W.D.Pa. 1992) ("It is the geographic region in which a purchaser can practically turn to other sellers for products or services, in the event that the defendant seeks to raise prices or reduce output."). With this standard in mind, the court will now determine whether Plaintiffs have met their burden of proving the geographic scope of the relevant product markets at issue in this matter.

*-Outpatient Cataract Facility Services*

Plaintiffs contend that the evidence conclusively establishes that the geographic scope of the outpatient cataract facility services market is Mifflin and Juniata Counties. Because, prior to the opening of MCCSC, the Hospital was the only facility in this geographic region where patients could receive outpatient cataract surgery, Plaintiffs contend that the Hospital's decisions to suspend Dr. Gordon, to impose the Conditions of Reappointment, and ultimately to revoke his privileges, are properly viewed as exercises of market power. According to Plaintiffs, these decisions allowed the Hospital to drastically reduce output, supply, and product quality in this geographic area by forcing patients to either use the Hospital or to forego cataract surgery altogether. To support their conclusion that Mifflin and Juniata Counties comprise the relevant geographic market, Plaintiffs introduced the following types of evidence: (1) geographic characteristics of the Mifflin and Juniata Counties region; (2) the types of patients who need cataract surgery; (3) the process patients go through when getting cataract treatment;

(4) patient flow data indicating where patients go to have their cataracts treated; (5) statements by the Hospital; and (6) the views of market participants concerning the realities facing patients.

According to Plaintiffs, "[l]arge mountain ranges separate the residents of Mifflin County and Juniata County from other hospitals and surgery centers that provide cataract facility [and physician] services." (Pls. Prop. Findings of Fact at ¶ 158.) Additionally, cataract patients are almost always elderly and tend to dislike traveling distances. Moreover, the cataract condition limits the patient's ability to drive, making it more likely that those patients would choose to have their surgery procedure performed locally, rather than opt to travel outside Juniata and Mifflin Counties to hospitals or surgical centers located beyond the mountain ranges.

To bolster this contention, Dr. Gaynor testified about his analysis of patient migration data using the Elzinga–Hogerty test. This test was developed by professors of economics Kenneth G. Elzinga and Thomas F. Hogerty "to analyze patterns of consumer origin and destination and to identify relevant competitors" in a particular geographic location. *FTC v. Freeman Hosp.*, 69 F.3d at 264 (citing *United States v. Rockford Mem'l Corp.*, 717 F.Supp. 1251, 1266 (N.D.Ill.1989)). In theory, the Elzinga–Hogerty test measures not only the geographic contours of the market area, but whether a firm or firms has market power in that area. The test consists of two separate measures—LIFO (or "little in from the outside") and LOFI (or "little out from the inside"). "In the hospital context, a Lofi ... statistic signifies the percentage of patients in an area's hospitals who reside in the area (rather than outside the area)." *Rockford Mem'l Corp.*, 717 F.Supp. at 1266. "A 'Lifo' ... statistic

signifies the percentage of hospital patients from a particular area who remain in that area for hospital services.... This statistic is useful in determining whether patients in a particular area make substantial use of hospitals outside the area." *Id.* (citations omitted). A well defined market will highlight a geographic area in which few patients leave to seek treatment at facilities outside the area and few patients come from outside the area to have treatment performed at facilities located inside the area. *Id.* at 1267.

The Elzinga–Hogerty test suggests two standards which speak to the proportion of consumers who flow in and out of a particular area. One standard, is referred to as a "weak market," which constitutes a market in which no more than 25% of consumers from the area are flowing out ("LIFO") to other facilities and no less than 75% of the consumers who purchase the product or service at facilities located in the proposed market come from inside that area ("LOFI"). The "strong market" Elzinga–Hogerty test is met when the LIFO is no more than 10% and the LOFI is no less than 90%. If the patient migration data satisfies either of these standards, it indicates, in economic terms, that the market is geographically well defined and a firm or firms has some degree of market power in the geographic arena.

In calculating his Elzinga–Hogerty analysis of the geographic market for outpatient cataract surgery services, Dr. Gaynor used data compiled by the Pennsylvania Health Care Cost Containment Council ("The PHC–4"). This data listed most patients who underwent outpatient cataract surgery in a particular year, where those patients lived, where the patients underwent surgery, and which doctor performed the procedure. The PHC–4, however, did not begin compiling this data until 1996.[31]

---

**31.** Dr. Gaynor did not feel the 1996 data was an ideal period for determining LIFO and

Using this data, Dr. Gaynor sought to analyze whether the Hospital possessed market power sufficient to accomplish its alleged anti-competitive goals.

Applying the PHC–4 data for 1996, Dr. Gaynor began by calculating the Hospital's share of patients undergoing cataract surgery in a particular zip code and that zip code's percentage contribution to all of the cataract surgeries performed at the Hospital in that year. Dr. Gaynor continued this zip code by zip code analysis, calculating both the zip codes' individual LOFI and LIFO numbers and their cumulative inflow and outflow when combined with data from the other zip codes. Applying this methodology, Dr. Gaynor concluded that a twenty-three zip code area satisfied the criteria for a weak Elzinga–Hogerty market. Patients from this area constituted approximately 84.1% of the Hospital's outpatient cataract patients. Therefore, only 15.9% of the Hospital's cataract patients came from outside this twenty-three zip code area. The Hospital served approximately 77.8% of the outpatient cataract patients in those twenty-three zip codes, meaning that only 22.2% of the patients living in those zip codes went to facilities located outside of the area for outpatient cataract surgery. These twenty-three zip codes consist almost entirely of Mifflin and Juniata Counties.

The Elzinga–Hogerty test, however, has its weaknesses. First, Professor Elzinga has stated that the test is plaintiff oriented. That is, the tests "tend to give markets that are more favorable to plaintiffs, narrower markets than are actually the case." (Tr. (Harris) at 2396.) Second, the test is sensitive to zip code ordering. By ordering zip codes in a particular manner, the test can have the result of excluding producers who are located just outside the geographic fringe of the proposed market.[32] Third, by using an aggregate zip code analysis instead of an individual zip code analysis, the Elzinga–Hogerty test does not examine whether people in particular zip codes actually exercise choice. For all of these reasons, the Elzinga–Hogerty test tends to define geographic markets more narrowly, often excluding realistic competitors located just outside the geographic boundaries of the defined market. Perhaps for these reasons, Professor Elzinga has stated that the strong Elzinga–Hogerty test is the more accurate measure of a well defined antitrust market. The weak market test is just that, a weak indicator of a properly defined geographic market and a firm's market power.

LOFI because the Hospital suspended Dr. Gordon twice—the forty-five day suspension and the intervening summary suspension—and imposed the Conditions of Reappointment during that year. Thus, according to Dr. Gaynor, because the Hospital had already engaged in allegedly predatory conduct during 1996, "it is possible that, if anything, that could have artificially inflated the size of the geographic market." (Tr. (Gaynor) at 1306.) Dr. Gaynor's conclusion, in this respect, is based on nothing more than mere speculation. According to Dr. Gaynor, "the fact that Dr. Gordon is suspended and people can't see him disrupts the market. Then some people may choose to go elsewhere." (*Id.*) However, without data indicating that patients actually did go elsewhere as a result of Dr. Gordon's suspensions, the court is unwilling to accept Dr. Gaynor's conclusion that the 1996 data would inflate the breadth of the proposed geographic market. Moreover, even if patients fled Mifflin and Juniata Counties for cataract surgery, this would seem to suggest that patients viewed other suppliers of physician services as viable alternatives to Dr. Gordon and Dr. Nancollas. Thus, if this proves anything, it would prove that the geographic market is broader than Dr. Gaynor's Elzinga–Hogerty analysis suggests; not that it was artificially inflated.

**32.** In fact, when Dr. Gaynor sorted the zip codes according to their importance to the Hospital, the data did not satisfy either of the Elzinga–Hogerty tests. (*See* Tr. (Gaynor) at 1461; *see also* Appendix, Ex. A.)

In this case, the data suggested that a weak market existed which covered most of Mifflin and Juniata Counties. The court, however, finds that the weak Elzinga–Hogerty standard unjustifiably disregards the fact that almost one-quarter of all patients within Mifflin and Juniata Counties were exercising choice in 1996 by having their procedures performed at facilities located outside of the two counties. *See FTC v. Tenet Health Care Corp.*, 186 F.3d at 1053 ("In adopting the FTC's position [based on the Elzinga–Hogerty test], the district court improperly discounted the fact that over twenty-two percent of people in the most important zip codes already use hospitals outside the FTC's proposed market for treatment that is offered at Poplar Bluff hospitals."). Moreover, by focusing on what patients were doing in 1996—not what patients could have done in the event the Hospital attempted to lower quality or output—the Elzinga–Hogerty analysis does a disservice to the purpose of conducting a geographical analysis of the market's breadth: identifying realistic substitute suppliers. *See Surgical Care Ctr.*, 309 F.3d at 840 ("Absent a showing of where people could practicably go for inpatient services, St. Luke's failed to meet its burden of presenting sufficient evidence to define the relevant geographic market."); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir.2001) ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic."); *Tenet Health Care*, 186 F.3d at 1052 ("This evidence must address where consumers could practicably go, not on where they actually go."); *Doctor's Hosp.*, 123 F.3d at 311 ("Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raised prices.... The possibilities for substitution must be considered."(citations omitted)). Identifying substitute suppliers is important because, even if a group of consumers has a strong preference for a particular supplier, consumers could offset an exercise of market power by resorting to substitute suppliers located within the geographic scope of the market. *Miller v. Indiana Hosp.*, 814 F.Supp. at 1262 (" 'Because we are concerned only with an area in which competition could be harmed, the relevant geographic market must be broad enough that buyers would be unable to switch to alternative sellers in sufficient numbers to defeat an exercise of market power by firms in the area....' " (quoting *In the Matter of Hosp. Corp. of America*, 106 F.T.C. 361, 466 (1985) *aff'd by Hospital Corp. of America v. FTC*, 807 F.2d 1381 (7th Cir.1986))). Because Dr. Gaynor's proposed geographic market failed to include those facilities which realistically compete with the Hospital, the court finds that Dr. Gaynor's analysis does not accurately portray the geographic market for outpatient cataract surgery services. *See infra* at pp. 429–432.

Even if the court were to accept the Elzinga–Hogerty test with all of its inherent deficiencies, Dr. Gaynor's application of that test suffered from a more fundamental flaw, incomplete data. While the PHC–4 began compiling data regarding outpatient cataract surgery in 1996, the 1996 data did not include any patient origin data for outpatient cataract surgery procedures performed at free-standing surgery centers. As a result, the PHC–4 data for 1996 did not include any cataract surgeries performed at either the Pennsylvania Eye Surgery Center or the Ophthalmology Laser & Surgical Center. Both of these surgical centers are located within thirty miles of the eastern border of Juniata County and both were performing outpatient cataract surgery in 1996. If as few as sixty-one additional patients residing in

Dr. Gaynor's twenty-three zip code proposed market received treatment at either of these facilities (or any other free-standing facility in Pennsylvania for that matter), the data would not satisfy even the weak Elzinga–Hogerty test.[33] (*See* Appendix Ex. B.)

■ Plaintiffs argue that the geography of central Pennsylvania and the demographics of the typical cataract patient support Dr. Gaynor's Elzinga–Hogerty analysis, indicating an isolated geographic market. However, it is clear that Plaintiffs' arguments regarding the geographic and demographic conditions are inaccurate. To begin with, Plaintiffs contend that elderly cataract patients are unwilling to travel outside Juniata and Mifflin Counties for outpatient surgery. Plaintiffs, however, grossly over-exaggerate the hardships of traveling from Mifflin and Juniata counties to hospitals lying in close proximity to these areas. Three facilities that perform outpatient cataract surgery are located within a thirty-six mile drive from Lewistown Hospital, which is located at, or near, the geographic epicenter of Plaintiffs' proposed geographic market. These facilities are J.C. Blair Hospital in Huntingdon County, Pennsylvania (approximately thirty-six driving miles away); Centre Community Hospital in State College, Pennsylvania (approximately thirty-one driving miles away); and Centre Community Surgical Center (located adjacent to Centre Community Hospital). According to mapquest.com, it would take a person traveling from Lewistown Hospital fifty-six minutes to travel to J.C. Blair Hospital and thirty-nine minutes to travel to Centre Community Surgical Center or Centre Community Hospital. (*See* Attached Exs. C and D.)[34] Of course, many residents of Mifflin and Juniata Counties live in areas which are a much shorter drive to these facilities. For those patients, J.C. Blair, Centre Community Hospital, and Centre Community Surgical Center are obviously attractive options for patients seeking to have outpatient cataract surgery. These facilities are each located within five miles of highways—U.S. Routes 22, 322, and 522—which also traverse both Mifflin and Juniata Counties.

The statistics back up this conclusion. In 1996, 635 "Gordon/Nancollas" procedures were performed at the Hospital.[35] 589, or 92.8%, of these procedures were performed on patients coming from a twenty-eight zip code area. From this same area, the Centre Community facilities drew 243 patients and J.C. Blair drew 188 patients. The Hospital's share of all "Gordon/Nancollas" procedure patients in these zip codes was 46.3%. Meanwhile, the Centre Community facilities and J.C. Blair had 19.1% and 14.8% shares respectively. The remaining 19.5% of patients sought treatment from facilities located over thirty miles from Lewistown. While the Hospital may have been the dominant player in this market, the numbers indicate that ophthalmic surgery patients viewed Centre Community and J.C. Blair as viable substitutes to whom they could resort in the event the Hospital attempted to decrease output or lower quality.

Likewise, Plaintiffs' claim regarding the demographics of cataract patients and the topography of central Pennsylvania is also flawed. Plaintiffs claim that because cata-

---

**33.** 670 patients from Dr. Gaynor's proposed twenty-three zip code market underwent outpatient cataract surgery at hospitals in 1996.

**34.** The court may take judicial notice of these facts. *See* Fed.R.Evid. 201.

**35.** As stated previously, outpatient cataract surgery procedures accounted for over 95% of the Gordon/Nancollas procedures. (*See* Tr. (Harris) at 2346.)

ract patients are elderly and often cannot drive long distances, or are prohibited by law from driving at all, they are unwilling or unable to undergo outpatient cataract surgery anywhere outside of Mifflin and/or Juniata County. This contention, however, neglects the fact that cataract removal surgery is an outpatient procedure which renders the patient unable to drive afterwards. As a result, patients undergoing this procedure must have someone with them who will drive them home after they are discharged. Therefore, unless these elderly patients walk to the Hospital for outpatient cataract surgery, their ability or willingness to drive outside of Plaintiffs' proposed geographic market is not a reliable indicator of whether J.C. Blair, the Centre Community facilities, or any other facilities are realistic options for patients in this area.

Even if the court were to impute the patients' unwillingness or inability to drive longer distances to their drivers, the court finds that, due to the seriousness of cataracts, the distances between Juniata and Mifflin Counties and these facilities are not so great that patients would not view these facilities as realistic alternatives to the Hospital and its surgeons. A cataract fundamentally affects a person's ability to see, oftentimes limiting the patient's ability to perform their job or to live their life in the manner to which the patient is accustomed. As a result, patients should be willing to travel at least some appreciable distance for treatment. While convenience of location is somewhat important to consumers, the court cannot say that patients would not be willing to travel up to an hour for treatment. J.C. Blair and the Centre Community facilities are only a twenty minute to an hour drive away from patients residing in Mifflin and Juniata Counties, and thus must be considered as competitors with the Hospital for outpatient cataract surgery patients.

It should be noted that in 1996, these facilities most likely viewed the Hospital and its surgeons as competitors. During that year, seventeen patients from zip code 16652 had a Gordon/Nancollas procedure performed on them at the Hospital. J.C. Blair is located in zip code 16652. If seventeen patients from that zip code—or 14.2% of all patients in that zip code who were treated for cataracts in 1996—were willing to travel to Lewistown for treatment despite the fact that J.C. Blair was located practically next door, this would seem to cut against Plaintiffs' contention that elderly patients are unwilling to cross the mountain ranges for treatment. Presumably, patients traveling from Huntingdon would encounter the same obstacles traveling to Lewistown as patients from Mifflin and Juniata Counties would face in traveling to J.C. Blair.

Similarly, the Hospital performed Gordon/Nancollas procedures on eleven patients from zip code 16823. This represented a 5.4% share of all patients from that zip code, which corresponds to the village of Bellefonte, located no more than fifteen driving miles north of State College, but at least thirty driving miles from Lewistown. (See Appendix, Exs. E and F.) To travel from Bellefonte to Lewistown, patients use the same highway, Route 322, that patients use to travel from Mifflin and Juniata Counties to the Centre Community facilities in State College.

If twenty-eight patients from these two rural zip codes located in close proximity to other facilities were willing to cross the mountain ranges and travel over twice the distance to have their outpatient cataract surgery performed at the Hospital, then this undercuts Plaintiffs' contention that the Hospital was not in competition with J.C. Blair and the Centre Community facilities. If the Hospital was viewed as a viable alternative for patients living direct-

ly outside of Mifflin and Juniata Counties, then surely facilities lying directly outside Mifflin and Juniata Counties were viewed as viable alternative facilities by patients residing within Mifflin and Juniata Counties. As a result, these facilities must be included in any calculation regarding the Hospital's market share.

At the very least, referring optometrists in Lewistown viewed many other facilities outside Mifflin and Juniata Counties as viable alternatives for their patients.[36] Because most patients see their optometrists on a regular basis, optometrists are generally the physicians who first diagnose a patient as suffering from cataracts. Consequently, referrals from optometrists are an important source of patients for ophthalmologists who perform outpatient cataract surgery. Their referrals are reliable indicators of realistic alternative facilities which should be included in any properly defined geographic market. At trial, two optometrists practicing in Lewistown, Dr. Robert Burns and Dr. Michael Hutton, testified regarding their pattern of referrals. Dr. Burns testified that he informs patients whom he has diagnosed with cataracts that they can obtain treatment from physicians in Lewistown, State College, Lewisburg, Harrisburg, and even Altoona. Likewise, Dr. Hutton has referred cataract patients to physicians practicing in Lewistown, Lewisburg, State College, Harrisburg, and Huntingdon. This testimony, by physicians who are reliable barometers of competitive conditions in the physician services markets, further bolsters the conclusion that physicians and patients can, and do, choose from a variety of facilities and physicians both in and outside of Plaintiffs'

proposed geographic area in deciding where to have outpatient cataract surgery performed. Thus, patients in Mifflin and Juniata Counties are not, as Plaintiffs contend, limited to choosing Lewistown Hospital and its physicians for cataract surgery. *See Cogan v. Harford Mem'l Hosp.*, 843 F.Supp. 1013, 1019 (D.Md.1994) ("The relevant geographic market must include those facilities which referring physicians and patients would perceive as attractive alternatives to [the defendant].").

Plaintiffs also contend that several pieces of disparate evidence indicate both that the Hospital viewed Mifflin and Juniata Counties as the geographic market for outpatient cataract facility services, and other industry participants echoed this view. Specifically, Plaintiffs rely upon a statement that the Hospital's Administration made to Standard & Poor's, a bond credit rating company, to the effect that the Hospital has a "dominant market position as a sole community provider that captures 77% of all discharges *in the primary service area of Mifflin and Juniata Counties.*" (Pl.Ex. 110 (emphasis added).) Plaintiffs also point to a statement, by Hospital personnel, in opposition to Dr. Gordon's application for a CON to open his proposed surgical center. In that document, the Hospital defined their primary service area as Mifflin and Juniata Counties. (*See* Def. Ex. 39.)[37] Plaintiffs highlight a similar statement in a presentation put together by a consultant on behalf of the Hospital. (*See* Def. Ex. 25.)

■ These statements, however, refer to the Hospital's primary service area, not the geographic market for outpatient cata-

---

**36.** Basically, optometry involves examining the human eye for pathologies and the treatment of minor eye diseases such as conjunctivitis—inflamation of the eye. While optometrists may write prescriptions for eye glasses and some medications, they are not able to perform surgery. (*See* Tr. (Burns) at 2122.)

**37.** This document, however, also includes Snyder and Huntingdon Counties in its definition of its primary service area. (*See id.* at p. 15.)

ract surgery services. There is voluminous case law holding that a firm's service area, alone, does not equate to a market's geographic scope. *See, e.g., Surgical Care Ctr. v. Hospital Serv. Dist. No. 1,* 309 F.3d 836, 840 (5th Cir.2002) (" '[T]rade area is not necessarily the relevant geographic market for purposes of antitrust analysis' because geographic market evidence must take into account 'where consumers could practicably go, not where they actually go.' " (quoting *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 208 F.3d 655, 662 (8th Cir.2000))); *Tenet Health Care,* 186 F.3d at 1052 ("A service area, however, is not necessarily a merging firm's geographic market for purposes of antitrust analysis."); *Bathke v. Casey's General Stores, Inc.,* 64 F.3d 340, 346–47 (8th Cir.1995) (rejecting service area as proposed geographic market because such a conclusion "looks at the issue only from the perspective of Casey's rivals, not from the perspective of the consumer"); *Tunis Bros. v. Ford Motor Co.,* 952 F.2d 715, 726 (3d Cir.1991) ("[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product."); *Delaware Health Care, Inc. v. MCD Holding Co.,* 957 F.Supp. 535, 540 (D.Del.1997) (quoting *Tunis Bros.,* 952 F.2d at 726); *Miller v. Indiana Hosp.,* 814 F.Supp. at 1263 ("[A] county is not the relevant geographic market in a single hospital county merely based on the hospital's service area."); *Doctors Steuer & Latham, P.A. v. National Med. Enters., Inc.,* 672 F.Supp. 1489, 1511 (D.S.C.1987) ("In order to convert a 'service area' into a geographic market, it is necessary to offer evidence regarding elasticity of demand and barriers to entry . . . .").

Other relevant evidence tends to rebut Plaintiffs' contention that the Hospital's service area and the geographic scope of the outpatient cataract surgery markets are coextensive. There are several other large facilities and high quality physicians located in close proximity to Plaintiffs' proposed market who could provide substitute service in the event the Hospital attempted to lower product quality or production levels. Additionally, while the obstacles to entry in the outpatient cataract facility services market are more than minimal, the court cannot conclude that these obstacles effectively preclude the entry of alternative producers. Dr. Gordon's opening of MCCSC undercuts such a conclusion.[38] This is not to say that evidence of a firm's service area is irrelevant to defining the geographic market. However, where, as here, the other evidence strongly repudiates a finding that the service area and the geographic market are co-extensive, the court will not accept the service area as the relevant geographic market for calculating the defendant's market share. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 202 (3d Cir.1992) (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 827 n. 72 (internal citations omitted)).

In sum, the court finds that Plaintiffs failed to satisfy their burden of proving the relevant geographic markets for outpatient cataract surgery facility and physician services. The relevant geographic market is not limited to Mifflin and Juniata Counties. Instead, the geographic market also includes those portions of the following counties which are located within a thirty mile radius of Lewistown: Snyder, Union, Clinton, Centre, Huntingdon, Franklin, Cumberland, and

---

38. With respect to the physician services aspect of the outpatient cataract surgery market, a physician need only obtain privileges at the Hospital, or another nearby hospital or surgery center (J.C. Blair, Centre Community, or even MCCSC for example), to begin immediately competing with Dr. Nancollas.

Perry. Plaintiffs have not included any calculation of the Hospital's share of outpatient cataract surgery patients in this expanded market.

■ Additionally, the court holds that Plaintiffs have failed to prove that the Hospital had market power in the relevant geographic market for outpatient cataract facility services. In the twenty-eight zip codes from which the Hospital drew 92.8% of their patients undergoing outpatient ophthalmic surgery in 1996, the Hospital's overall share was only 39%. The Third Circuit has held that a 55% market share is insufficient, as a matter of law, to establish that a firm possesses market power. *See Fineman*, 980 F.2d at 201; *see also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir.1984) (holding that even 60% market share is unlikely to suffice). *But see American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (holding that a two-thirds share, or approximately 66%, is sufficient to establish the inference of market power). As a result, the Hospital's 39% market share is legally deficient to establish market power.

For the following reasons, however, this number is not entirely indicative of the Hospital's market share for outpatient cataract surgery services in 1996:(1) this area contains five zip codes—17243, 17264, 16611, 16853, and 17842—which fall either fully or partially outside the thirty mile radius; and (2) the numbers compiled reflect all outpatient ophthalmic surgery cases—both cataract and non-cataract procedures. Nevertheless, the testimony at trial indicated that cataract surgeries constituted over 95 % of all "Gordon/Nancollas" cases. Thus, if one were to remove the cases of those patients residing in the five zip codes which fall either fully or partially outside of the thirty mile radius and assume that all non-cataract outpatient procedures were performed at facili-

ties other than the Hospital, the Hospital's market share would still only be 45.8%. It should also be remembered that this data does not include any procedures performed at free-standing surgery centers. *See supra* at pp. 428–429. Moreover, even if the court excludes all other facilities except the Hospital, J.C. Blair, and the Centre Community facilities—the only facilities performing outpatient cataract surgery in 1996 and located in the thirty mile radius—and it excludes those zip codes falling partially or fully outside the thirty mile radius, *and* the court assumes that all non-cataract procedures were performed at J.C. Blair and the Centre Community facilities, the Hospital's market share is still only 63.5%. While this is closer to the 66% threshold, it does not meet the threshold test and is based on a series of conservative assumptions which do not correspond to reality.

Similarly, the "Gordon/Nancollas" numbers for 1999 demonstrate a dramatic fall in the Hospital's market share. In that year, the Hospital drew 93% of its patients from a fifteen zip code area falling entirely within both Plaintiffs' proposed market and the court's thirty-mile radius market. Yet, the Hospital's share of this fifteen zip code area was only 32.3%. Even if one excludes all facilities located outside this fifteen zip code area, which excludes both Centre Community and J.C. Blair, and one assumes that all non-cataract procedures were performed at facilities other than the Hospital, the Hospital's market share is still only approximately 42.3%. The Hospital wasn't even the dominant provider of outpatient cataract surgery services in this area in 1999. Dr. Gordon performed 189 Gordon/Nancollas procedures on patients from this areas at MCCSC that year. Dr. Nancollas, the lone ophthalmologist at the Hospital in 1999, performed only 160 such procedures on patients from this area. That Dr. Gordon was able to open an

alternative facility—which became the dominant provider of outpatient cataract surgery services within less than two years of the Hospital's decision to revoke Dr. Gordon's privileges—tends to undercut the argument that the Hospital possessed market power in the facility services market sufficiently strong to alter competition in both the physician services and facility services markets for outpatient cataract surgery.

While these conclusions are not based on exact calculations of the Hospital's market share, they do demonstrate how woefully short the Hospital was of obtaining the benchmark 66% market share necessary for the court to infer market power. They are the court's best estimation of the Hospital's market share. Neither party provided the PHC–4 data to the court. In conclusion, the court finds that Plaintiffs have not demonstrated that the Hospital possessed market power in the market for outpatient cataract facility services.

*-Inpatient Eye Surgery Facility Services*

■ Plaintiffs contend that, like their proposed market for outpatient cataract surgery facility services, the geographic markets for the inpatient eye surgery facility services market consists of Mifflin and Juniata Counties. In support of this contention, Dr. Gaynor performed an Elzinga–Hogerty test using patient migration data for all inpatient procedures. Dr. Gaynor's calculations established a twenty-two zip code market for inpatient procedures which satisfied the weak market Elzinga–Hogerty standard, but not the strong market. This area encompasses almost all of Mifflin and Juniata Counties. For this reason, Dr. Gaynor opined that the geographic markets for inpatient eye surgery facility and physician services consist of Mifflin and Juniata Counties.

Unlike his analysis of outpatient cataract surgery patient migration data, the inpatient analysis did not suffer from incomplete data with respect to free-standing surgery centers because all inpatient procedures must be performed in a hospital. Moreover, the analysis of inpatient procedures was not as sensitive to the ordering of zip codes. The court rearranged the zip code analysis, sorting out zip codes in order of their importance to the Hospital. The court found that a seventeen zip code area satisfied the weak Elzinga–Hogerty test for general inpatient services. (*See* Appendix, Ex. G.) These seventeen zip codes represented approximately 92% of all inpatient procedures performed at the Hospital in 1996, and 75.4% of the patients undergoing treatment in this area had their procedure performed at the Hospital. A 75.4% share of the market is enough for the court to conclude that, in 1996, the Hospital had market power in the general inpatient facility services market. *See Fineman*, 980 F.2d at 201–02.

The general inpatient facility services market, however, is not at issue in this case. Rather, Plaintiffs bore the burden of demonstrating the geographic market for inpatient eye surgery facility services. Dr. Gaynor concluded that inpatient eye surgery procedures are so few that he could not perform a reliable statistical study of the geographic market. The court can accept this. However, Dr. Gaynor's conclusion regarding the geographic market for inpatient eye surgery is based on the presumption that this market is accurately portrayed by the geographic market for all inpatient procedures. (*See* Tr. (Gaynor) at 1337–38 ("... So my presumption is that the boundaries of the inpatient eye surgery [market] are not substantially different from the boundaries of the market for all inpatient hospital services is a reasonable representation of what the geographic market is for inpatient eye surgery.").) Plaintiffs, however, provide no explanation whatsoever as to why the data regarding general inpatient

procedures is a legitimate proxy for data regarding inpatient eye surgery. Without explanation as to why this is so, the court will not accept such a conclusion. Accordingly, the court finds that Plaintiffs' evidence is insufficient to establish the relevant geographic market for inpatient eye surgery facilities services.

Moreover, although the patient migration data for this market is statistically insufficient to do an Elzinga–Hogerty analysis, that data, even when limited to those patients in Plaintiffs' proposed geographic market, indicates that patients are willing to travel longer distances for inpatient eye surgery than for outpatient cataract surgery. In 1996, nineteen patients from Juniata and Mifflin counties underwent inpatient eye surgery. Of those patients, only eight chose to have their surgery performed at the Hospital. Besides one patient who underwent surgery at J.C. Blair, the remaining patients chose to have their procedures performed at hospitals located between thirty to seventy miles away from Lewistown. In 1998, only eleven patients from Mifflin County underwent inpatient eye surgery. No patients from Juniata County underwent inpatient eye surgery that year. Yet, despite the fact that the Hospital was located in their home county and inside the supposedly travel-restricting mountain ranges, the majority of patients opted to go elsewhere. Of those patients who opted to go elsewhere, 83.3% sought treatment at facilities located at least an hour's drive from Mifflin County.

 These numbers seem to indicate that patients are more willing to travel to have inpatient eye surgery, which would comply with common sense. Inpatient surgery, by its very definition, is a more serious procedure and presumably involves treatment for more serious eye ailments than those which can be treated through outpatient care, including cataract removal surgery. Because these conditions are more serious, patients are more willing to travel longer distances for treatment than they would be to undergo an outpatient cataract removal procedure. Accordingly, the geographic market for inpatient eye surgery must be broader than that of outpatient cataract surgery services. Given that the geographic market for outpatient cataract surgery facility services is a thirty-mile radius from Lewistown, the court finds that the geographic market for inpatient eye surgery should include all hospitals within a fifty-mile radius of Lewistown. Thus, the following hospitals should be included in any calculation of the Hospital's market share in the market for inpatient eye surgery facility services: Lewistown, Centre Community, J.C. Blair, Philipsburg, Tyrone, Altoona, Bon Secours–Holy Family System, Nason, Carlisle, Holy Spirit, Pinnacle Health System (Harrisburg Hospital), Community General Osteopathic, Sunbury Community, and Evangelical Community.

Plaintiffs have not presented the court with a calculation of the Hospital's market share in this area. Thus, the court finds that Plaintiffs have failed to meet their burden of demonstrating that the Hospital possessed market power in the market for inpatient eye surgery facility services. Therefore, the Hospital did not have sufficient power to harm competition in either the facility services or physician services components of the market for inpatient eye surgery.

*-Emergency Eye Surgery Facility Services*

 Plaintiffs claim that the geographic region for emergency eye surgery facilities should be much smaller than it is for outpatient cataract surgery facility services. The court agrees. As testimony at trial, both expert and anecdotal, made gruesomely clear, emergency eye conditions are usually severe and need immediate attention. (*See* Tr. (Hawk) at 644–

45;[39] *see also* Tr. (Gaynor) at 1338.) Many of these conditions threaten the patient's permanent vision and can sometimes even result in death. (*See, e.g.* Tr. (Silverstone) at 1071–75.) Thus, logic dictates that patients in an emergency situation will choose to use the emergency facility which is located closest to the patient at the time he or she suffers injury.

After reviewing the evidence regarding the topography of central Pennsylvania and the layout of highway routes, the court concludes that the Hospital is the most conveniently located emergency eye surgery facility in Mifflin and Juniata Counties. For patients living in this area, there are no other reasonable alternative facilities at which they could seek services without traveling a significant distance. In an emergency situation, where limiting the elapse of time between injury and treatment is of utmost importance, patients are unlikely to travel long distances for care. Additionally, it would be extremely difficult for another competitor to enter the market if the Hospital acted to reduce output or lower quality, as Plaintiffs allege it has. To enter this market, a competitor would have to construct a new hospital. Given the rural nature of this area, it is doubtful that the costs of such an endeavor would be fiscally viable. Based on these factors, the court finds that Plaintiffs have established that the relevant geographic market for emergency eye surgery facility services is Mifflin and Juniata Counties. Consequently, because the Hospital is the only facility at which patients can obtain such care in this geographic area, the court finds that the Hospital has a 100% share of this market. This, of course, is sufficient to demonstrate that the Hospital has market power in the market for emergency eye surgery facility services.

### iii. Market Analysis Conclusion

In conclusion, the court finds that the following constitute the relevant product markets in this case: (1) outpatient cataract facility services; (2) outpatient cataract physician services; (3) facility services for inpatient eye surgery; (4) facility services for emergency eye surgery; (5) physician services for inpatient eye surgery; and (6) physician services for emergency eye surgery. These are essentially three sets of complementary product markets. Because the product markets are complementary, their geographic market should be identical.

The court finds that Plaintiffs failed to meet their burden of demonstrating that the outpatient cataract surgery services markets consist only of Mifflin and Juniata Counties. Instead, the court finds that the geographic market for outpatient cataract surgery facility services includes all hospitals and surgical centers located within thirty miles of Lewistown. Additionally, Plaintiffs have likewise failed to establish that Mifflin and Juniata Counties constitute the geographic market for inpatient eye surgery facility services. Instead, the court finds that the geographic market for inpatient eye surgery facility services must include all hospitals located within a fifty-

---

**39.** At trial, Ms. Hawk described the injury her husband sustained:

Q: What happened right after, if anything, that [metal] strap broke and hit him in the face?

A: He started yelling I lost my, I lost my eye. It hit him right in the eye. That is what he figured happened. Whenever he got hit in the eye, he figured something happened to his eye.

So I jumped out of the truck. I walked over. I looked at it. There was like a lot of white—all like a lot of gooey stuff in the front hanging down on his cheek.

Q: Could you see what people ordinarily think to be an eye?

A: The eye wasn't hanging out. It was like—I found it was like from the back of the eye hanging.

(Tr. (Hawk) at 644–45.)

mile radius of Lewistown. Likewise, the court finds that Plaintiffs have failed to demonstrate that the Hospital has, or at one time possessed, market power in the relevant geographic markets for either outpatient cataract surgery facility services or inpatient eye surgery facility services. Because the Hospital does not provide physician services, it cannot have market power in any of the complimentary physician services markets at issue in this case.

The court, however, finds that Plaintiffs have met their burden of demonstrating that Mifflin and Juniata Counties are the geographic border of the emergency eye surgery facility services market. Similarly, the court finds that Plaintiffs have demonstrated that the Hospital has market power in the relevant geographic area of the emergency eye surgery facility services product market.

c. Actual Anti–Competitive Effects

 Although the court has found that Plaintiffs failed to meet their burden of demonstrating that the Hospital possessed market power in the facility services markets for outpatient cataract surgery and inpatient eye surgery, Plaintiffs may still satisfy their initial burden by demonstrating that the Hospital's actions had an actual adverse effect on competition in these markets or in the complimentary physician services markets. *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). Injury to Dr. Gordon's practice is not dispositive of this issue. "In other words because 'antitrust law aims to protect competition, not competitors [a court] must analyze the antitrust injury question from the viewpoint of the consumer.'" *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d

624, 641 (3d Cir.1996) (quoting *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir.1987) (internal citations omitted)); *see also Miller v. Indiana Hosp.*, 814 F.Supp. at 1265 (" 'For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action.'" (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir.1991) (internal citation omitted))). "An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, ..." not just his own welfare. *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir.1991). Even if the plaintiff is successful in proving that output dropped or quality suffered, the plaintiff must still demonstrate that the defendant's conduct proximately caused the detrimental effect on competition. *Petruzzi's IGA Supermkts., Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.1993).

In this case, Plaintiffs contend that the Conditions of Reappointment adversely affected competition in two ways. First, Plaintiffs claim that the Conditions limited Dr. Gordon's ability to communicate truthful comparative information to patients and other members of the Medical–Dental Staff. Second, Plaintiffs claim that the Hospital's exclusion of Dr. Gordon—which flowed from the Hospital's decision to impose the Conditions of Reappointment—injured competition by ensuring that there was insufficient providers of physician services to cover demand and by limiting patients' access to superior ophthalmic surgical services.[40]

40. To the extent Plaintiffs also argue that the Hospital injured competition in the facility services markets through its exclusive contract with the anesthesiologists, that claim

must fail. The market for such services is national in scope. *See Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir.1994) (affirming dis-

As to Plaintiffs' first argument, the court agrees with Plaintiffs that the communication of truthful information to patients and other physicians is an important aspect of competition in the field of medicine. As stated earlier, physicians compete with each other primarily based on the quality of their service. *See supra* at Part II.A.1.b.i. Therefore, it follows that any unreasonable restraint on the free flow of information regarding the quality of service or surgical method, to either patients or referring physicians, will have an adverse effect on competition among physicians. However, reasonable regulations of the time, place, and manner of such communication encourage, rather than impede, robust competition by ensuring that its content is truthful, complete, and ethical. If the court were to adopt Plaintiffs' argument, any restraint on a physician's ability to communicate truthful medical information would constitute an adverse effect on competition. Thus, hypothetically, the Hospital's decision to discipline Dr. Gordon if he choose to drive around Lewistown in the wee hours of the morning proclaiming the benefits of phacoemulsification from a bull horn would be subject to antitrust scrutiny. Obviously, preventing a physician from engaging in such conduct does not harm competition. Therefore, a reasonable restraint on the dissemination of truthful information—that is, one which regulates the context in which the information is conveyed, rather than the content of that information—does not harm competition. *See, e.g., Oksanen,* 945 F.2d at 708 (4th Cir.1991) ("To keep the antitrust laws from becoming trivialized, the reasonableness of a restraint is evaluated based on its impact on competi-

tion as a whole within the relevant market.") (citing *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)).

■ In this sense, the court finds that the Conditions of Reappointment did not limit Dr. Gordon's ability to communicate truthful comparative information through advertising or any other means. Instead, Condition 2 merely regulated the manner in which Dr. Gordon could register internal complaints about any member of the Hospital staff, including Dr. Nancollas. Dr. Gordon was prone to engage in tempestuous verbal attacks on Dr. Nancollas and the nursing staff, sometimes in the presence of patients. Thus, the Credentials Committee felt it necessary to clearly delineate to him the proper means of registering such complaints. The Hospital did not prevent Dr. Gordon from making complaints or highlighting what he perceived as Dr. Nancollas' medically unsafe practices. To the contrary, on the single occasion that Dr. Gordon choose to express his concerns by registering a written complaint—the June 4, 1997 letter—the Hospital responded by launching a quality study even though Dr. Gordon inappropriately disseminated the letter to over thirty people.

Similarly, Condition 3 regulated the manner in which Dr. Gordon could communicate with patients of other physicians. Dr. Gordon had a practice of contacting Dr. Nancollas' patients for the purpose of verbally disparaging him. Sometimes, this occurred the night before Dr. Nancollas was to perform surgery on these patients. As a result, the Hospital felt it necessary

---

missal of Section 1 claim against hospital for exclusive dealing arising out of exclusive contract with anesthesiologists, in part, because "anesthesiologists compete in a multi-state, if not national, market"). Therefore, the Hospital's exclusive contract with its anesthesiolo-

gists did not injure competition in the facility services markets at issue in this case. Any facility needing an anesthesiologist to function could recruit such a physician from any source other than the Hospital; as Dr. Gordon did when he opened MCCSC.

to impose some limitations on how Dr. Gordon communicated with patients. Given Dr. Gordon's history, the court cannot say that this was unreasonable. Channeling complaints through the proper avenues assures that any organization, especially one as important as a hospital, is run in an efficient and effective manner.

Moreover, so long as Dr. Gordon did not mention Dr. Nancollas' name and Dr. Gordon did not intentionally contact Dr. Nancollas' patients, nothing in either Condition prevented Dr. Gordon from advertising or from highlighting the benefits of his method of cataract removal surgery over the ECCE method and the anesthesia complications of Dr. Nancollas' method to potential patients. Dr. Gordon placed at least two ads in the Lewistown Sentinel—on May 1, 1997 and on September 16, 1997—after the Hospital imposed the Conditions of Reappointment. In the second ad, Dr. Gordon pointed out the increased risks of Dr. Nancollas' procedure without referring to him by name or as "the Geisinger physician." The Hospital took no disciplinary action against Dr. Gordon as a result of these ads. In fact, on the lone occasion that the Hospital even intimated that Dr. Gordon might be subject to discipline based on the content of his advertisements, it did so only because it believed that Dr. Gordon had included dishonest or materially misleading information about an alleged survey of anesthesiologists practicing at the Hospital. *See supra* at Part I.D.5. However, even on that occasion Whitcomb stated that, "[i]t is recognized that you have the right to place such advertisements and to control the content thereof." (Pls.Ex. 173.)

Therefore, the court finds that the Conditions of Reappointment did not, as Plaintiffs contend, unreasonably limit Dr. Gordon's ability to communicate truthful information to patients and other physicians. Instead, these conditions merely regulated the manner and context in which Dr. Gordon would be allowed to communicate this information. Such regulations, so long as they are reasonable in light of the surrounding circumstances, do not constitute adverse effects on competition. In this case, given Dr. Gordon's tendency to engage in vituperative discourse about Dr. Nancollas in inappropriate settings, the court finds that Conditions 2 and 3 were reasonable. *See infra* at Part II.A.2.

Dr. Gordon also contends that the Conditions of Reappointment resulted in his being excluded from the Hospital and that this limited the natural range of options in the marketplace in at least two ways. First, according to Dr. Gordon, the restraint left consumers with insufficient emergency eye surgery physician services and outpatient cataract surgery physician services. Second, the exclusion denied patients the choice of a higher quality ophthalmologist.

■ With respect to insufficient service, even assuming that Dr. Gordon's exclusion flowed from the Conditions of Reappointment, the evidence did not demonstrate that his exclusion prevented Dr. Gordon from treating cataract patients. Instead, the exclusion only prevented Dr. Gordon from treating cataract patients at the Hospital. This may constitute an injury to Dr. Gordon, but it does not constitute an injury to competition among providers of outpatient cataract surgery physician services. *See, e.g., Mathews,* 87 F.3d at 641 ("The district court also pointed out that the Board's restrictions on Dr. Mathews privileges do not completely extinguish Dr. Mathews' ability to provide low cost services, but merely curtail his ability to perform spine surgery at Lancaster General. We believe the record supports [this] conclusion."); *see also Urdinaran v. Aarons,* 115 F.Supp.2d 484, 491 (D.N.J.2000) ("[I]n

light of the fact that Plaintiff voluntarily relinquished his privileges ... there is some question whether he can allege damages at all.... [E]ven if he could, [Plaintiff] provided no evidence that his patients could not have still utilized his services at Shore Memorial ... which is ... a few miles away...."). Dr. Gordon has opened his own surgery center and is now treating a significant number of cataract patients. Additionally, there are several other physicians performing outpatient cataract surgery in this area. Even during the period between the Hospital's decision to expel Dr. Gordon and the opening of MCCSC, Dr. Gordon performed a substantial number of surgeries on residents of the Mifflin/Juniata Counties area at the Pennsylvania Eye Surgery Center. In short, there were, and continue to be, enough providers of outpatient cataract surgery physician services in this area to meet demand. *See Mathews,* 87 F.3d at 641 ("The district court found the evidence does not support the existence of an antitrust injury resulting from a restriction on Dr. Mathews' privileges ... because orthopedic services are still readily available to consumers in the Lancaster area from a large and ever-increasing number of providers."); (*see also* Def. Ex. 547, Ex. 18 at p. 2) (indicating that in 1997, 895 patients from the Hospital's service area underwent a Gordon/Nancollas Procedure, while in 1999, 1,479 patients from this area underwent such a procedure).[41]

▮ Only with respect to the emergency eye surgery physician services market does Plaintiffs' contention as to insufficient service have any plausible merit. In this context, there is now only one provider of

emergency eye surgery physician services in the relevant geographic market, Dr. Nancollas. Testimony at trial indicated that it is unlikely that one ophthalmologist can provide sufficient emergency room coverage. (*See, e.g.,* Tr. (Silverstone) at 1075 ("Q: ... Is it your opinion Dr. Silverstone, that Dr. Nancollas is unable to supply on a sole source basis adequate hospital emergency services for ophthalmic problems? A: You could substitute any doctor's name there. One doctor cannot ... be a sole source of adequate hospital service for ophthalmic problems.").) Moreover, anecdotal evidence at trial supported this conclusion. (*See, e.g.,* Tr. (Hawk) at 646–48 (indicating that after stabilization, Hawk's husband was transferred by ambulance from the Hospital to Geisinger Hospital in Danville—almost two hours away—to undergo emergency eye surgery).)

However, it is one thing to say that Dr. Gordon's exclusion has caused an injury to competition in the emergency eye surgery physician services market, it is quite another to say that the Hospital's decision to impose the Conditions of Reappointment caused this injury. Plaintiffs seem to be arguing *res ipsa loquitur* ("the thing speaks for itself"). That is, the Hospital imposed the Conditions, Dr. Gordon had his privileges revoked for violating the Conditions, and now there are insufficient ophthalmologists to provide emergency eye surgery services in the geographic market. Therefore, the Hospital's decision to impose the Conditions of Reappointment must have caused the injury to competition. However, as stated above, the Conditions of Reappointment were reasonable in light of Dr. Gordon's past conduct.

---

41. Plaintiffs presented no evidence whatsoever indicating that there are not enough providers of inpatient eye surgery physician services to meet demand. Moreover, the court finds that any such contention would be implausible. Inpatient eye surgery is quite rare and the geographic scope of this market is quite broad. *See supra* at Part II.A.1.b.i. Therefore, it is almost impossible that there are not enough ophthalmologists in the market to meet current levels of demand.

Additionally, the Conditions at issue did not mention emergency eye surgery services and did not impact, in any way, Dr. Gordon's ability to provide such service.[42] Therefore, Dr. Gordon's conscious decision to violate the Conditions, rather than the decision to impose the Conditions, caused the injury to competition.[43] Had Dr. Gordon not violated the Conditions, he would not have been excluded. If he would not have been excluded, there would be enough ophthalmologists at the Hospital to provide the necessary level of service. Thus, it is Dr. Gordon's conduct, rather than the Hospital's decision, that injured competition. This is demonstrated by the fact that in the period between when the Hospital imposed the Conditions and Dr. Gordon was ultimately excluded from the Hospital, no injury to competition in the emergency eye surgery physician services market took place. Dr. Gordon's conduct is an intervening cause, breaking the chain of causation between the Hospital's decision to impose the Conditions and the ultimate injury to competition. As a result, the Hospital's decision was not the proximate cause of that injury. Likewise, with respect to the physician services markets for outpatient cataract eye surgery, even if the court were to accept Plaintiffs' aver-

ment that there is, or was at one time, insufficient service to satisfy demand, this does not automatically lead to the conclusion that the Hospital's decision to impose the Conditions proximately caused it.

Plaintiffs' contention that the Hospital's decision to impose the Conditions foreclosed patients from access to higher quality ophthalmic service suffers from the same defect.[44] That is, even if the court were to assume that patients are forced to use lower quality services, it is Dr. Gordon's decision to violate those Conditions which produced the adverse consequence to consumers. As a result, the court finds that Plaintiffs have failed to prove anti-competitive effects which were proximately caused by the Hospital's decision to impose paragraphs 2 and 3 of the Conditions of Reappointment.

d. Summation of Plaintiffs' Initial Burden

Plaintiffs have satisfied their initial burden of demonstrating that the Hospital engaged in concerted action placing its conduct within the purview of Section 1 of the Sherman Act. *See supra* at Part II. A.1.a. However, with the exception of the market for emergency eye surgery facility services, Plaintiffs have failed to meet

---

**42.** Moreover, the Third Circuit has held that *res ipsa loquitur* is an impermissible manner of proving causation in cases evaluated under the rule of reason test. *See Town and Sound Custom Tops v. Chrysler Motors Corp.*, 959 F.2d 468, 486 (3d Cir.1992) ("To the extent that *res ipsa loquitur* ... is a doctrine of the antitrust laws, it is limited to per se cases.").

**43.** If, on the other hand, the Conditions were unreasonably broad and precluded reasonable dissemination of truthful information to consumers, then the court could very well conclude that the injury to competition occurred as a result of the Hospital's decision to impose unreasonable restraints. However, as stated below, the Conditions were reasonable and narrowly tailored given Dr. Gordon's prior conduct. *See infra* at Parts I.A.2 and 3.

**44.** Moreover, it is clear that even if Dr. Gordon were excluded from the market altogether, there are other physicians in the market providing high-quality care. Even Dr. Nancollas' ECCE and phaco procedures, about which Dr. Gordon cavils at length, fall within the standard of care. Although Dr. Gordon may have been the most surgically talented ophthalmologist in this area, the other ophthalmologists are perfectly capable of providing adequate high-quality care to patients in his place. Therefore, this injury is not sufficient to qualify as an antitrust injury. *See Doctors Steuer & Latham, P.A. v. National Med. Enters.*, 672 F.Supp. 1489, 1504 (D.S.C. 1987) ("Practices that produce only an 'insignificant,' 'de minimis,' 'trivial,' or 'insubstantial' restriction on competition are not unlawful.").

their initial burden under the rule of reason. First, Plaintiffs have failed to demonstrate that the Hospital possessed market power in the facility services markets for outpatient cataract surgery and inpatient eye surgery. *See id.* at Part II.A.1.b. Second, the Hospital is not a participant in the physician services component of any of these markets, and, therefore, cannot possess market power in those markets. Third, to the extent any injury to competition occurred in the either the facility or physician services markets, the Hospital's decision to impose the Conditions of Reappointment was not the proximate cause of those antitrust injuries. *See id.* at Part II.A.1.c.

## 2. The Hospital's Pro–Competitive Objective

 Once a plaintiff has successfully met its initial burden under the traditional rule of reason, the burden then shifts to the defendant to "show that the challenged conduct promotes a sufficiently pro-competitive objective." *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993). The Hospital contends that its decision to impose the Conditions of Reappointment on Dr. Gordon was necessary to protect the internal cohesiveness of the Hospital's Staff. Additionally, by regulating the conduct of a persistently disruptive physician, the Hospital contends it intended to ensure that it would continue to provide high quality medical service to its patients, thus protecting and furthering its ability to compete with other facilities. Even assuming that Plaintiffs had satisfied their initial burden with respect to each of the antitrust markets in this case, the court would find that the Hospital met its burden of demonstrating that the Conditions of Reappointment served a pro-competitive objective. As the Third Circuit has stated:

> [W]e do not doubt that a hospital could exclude an applicant from staff privileges either because he is not medically qualified or because of unprofessional conduct, so long as the hospital applies the same standards to all applicants. This result does not skew our antitrust analysis. First, as to medical ability, restricting staff privileges to doctors who have achieved a specified level of medical ability falls within the scope of a hospital's "public service" function.... Applying the rule of reason analysis, it seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of the medical care that it delivers. Thus such action is pro-competitive and, therefore, permissible under the rule of reason.... The analysis for professional conduct is basically identical. The "public service" function of a hospital is to provide for effective and efficient medical treatment for its patients. One factor in the effective and efficient running of a hospital is a medical staff that can work together and be courteous to patients and staff. Doctors who have a history of trouble in interpersonal relations can legitimately be excluded because, if admitted, they will reduce the effectiveness of the medical staff, thereby reducing the ability of the hospital to provide top-flight service. In sum, doctors who have trouble getting along with other people will reduce efficiency, thereby reducing the hospital's competitive position, and, therefore, exclusion of such doctors is pro-competitive and permissible under the rule of reason.

*Weiss v. York Hosp.*, 745 F.2d 786, 821 n. 60 (3d Cir.1984) (citing Andrew K. Dolan & Richard S. Ralston, *Hospital Admitting Privileges and the Sherman Act*, 18 Houston L.Rev. 707, 719 and 735 (1981)).

If denying staff privileges to a physician based on unprofessional conduct is a suffi-

cient pro-competitive justification under the rule of reason, then placing reasonable conditions on a chronically disruptive physician's reappointment likewise serves the same pro-competitive ends. Because Dr. Gordon violated the Conditions of Reappointment, the Hospital's decision to expel him similarly serves interests that are consistent with the Sherman Act. Although it is unclear whether any other physician at the Hospital was subject to a conditional reappointment along the lines of Dr. Gordon's, it is clear that no other physician was prone to very public verbal diatribes about other physicians or had a practice of calling another physician's patients to comment on that physician's competence or surgical procedure. Moreover, it is unclear whether the Conditions actually imposed extra obligations on Dr. Gordon. (*See* Def. Ex. 227(A)(1) at Article II, Part A, §§ 1, 2(d)(2) and 4 (stating that "[a]ppointment to the medical staff is a privilege which shall only be extended to professionally competent individuals who continuously meet the qualifications, standards and requirements set forth in this policy and in such policies as are adopted from time to time by the Board" and that only those physicians who can document "adherence to the ethics of their profession" and an "ability to work harmoniously with others" are qualified for staff privileges at the Hospital).) That is, the Conditions of Reappointment merely required Dr. Gordon to comply with the professionalism and competency standards required of physicians in general. If anything, the *Conditions* simply delineated how the Hospital expected Dr. Gordon to behave for he had demonstrated either a complete disregard for these obligations or a complete ignorance of them. Once Dr. Gordon violated these conditions, the Hospital was obligated, out of professional concerns, to revoke his privileges. On facts

eerily similar to those of this case, the Fourth Circuit made the following pronouncement:

This case illustrates well the dilemma that hospitals face when they consider disciplining a physician by altering his admitting privileges. On the one hand, if the hospital failed to discipline a physician against whom documented complaints were legion, the efficiency of the entire institution could be affected and the hospital could even be exposing itself to malpractice liability. Yet, if the hospital takes corrective action, it and its medical staff face the prospect of a disgruntled physician bringing an antitrust suit against them.

. . . . .

In our view, the antitrust laws were *not intended to inhibit hospitals from promoting quality patient care through peer review. . . .* While we cannot say that no peer review decision would ever implicate the Sherman Act's concern for competition, this assuredly is not such a case. Page Memorial [Hospital] simply took measured steps to discipline an imperious physician. In taking these actions, Page Memorial and its medical staff have [not] violated . . . federal . . . law.

*Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 711 (4th Cir.1991).

In short, the court finds that even if Plaintiffs had satisfied their initial burden with respect to every relevant antitrust market in this case, the court would have found that the Hospital met its burden of proving a pro-competitive justification for its decision to impose paragraphs 2 and 3 of the Conditions of Reappointment.

### 3. Plaintiff's Ultimate Burden

 Because the Hospital carried its burden under the rule of reason,[45] Plain-

---

**45.** Of course, the court has already ruled that,

with the exception of the market for emergen-

tiffs bear the ultimate burden of demonstrating that the "restraint is not necessary to achieve the stated objective." *Brown Univ.*, 5 F.3d at 668. At this stage, "[t]he finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). At this stage, "the test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683(1918); *see also Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 82–83 (3d Cir.1977) ("The ultimate test of legality, of course, is whether the particular restraint promotes or impairs competition.").

Plaintiffs contend that Conditions 2 and 3 were overly broad. *See Brown Univ.*, 5 F.3d at 678–79 ("Even if an anticompetitive restraint is intended to achieve a legitimate objective, the restraint only survives a rule of reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant.") According to Plaintiffs, "Condition 2 broadly prohibited *any* communication of *any* concern about *any* other doctor or nurse to *anyone* outside of a few specified people." (Pls. Proposed Conclusions of Law at ¶ 67 (emphasis in original).) As such, "Condition 2 would bar Dr. Gordon from telling referring physicians about his concerns

with his competitors outdated and risky methods." (*Id.* at ¶ 68.)

However, Condition 2 was not as far sweeping as Plaintiffs claim. Dr. Gordon was not prohibited in any way from commenting upon a particular surgical method to anyone, let alone referring physicians. Instead, Dr. Gordon was prohibited from making unrestrained comments about particular physicians or nurses. Additionally, to the extent Dr. Gordon claims that associating Dr. Nancollas with ECCE was necessary for Dr. Gordon to obtain referrals, this simply is not true. The optometrists in Lewistown, the primary source of referrals for both Dr. Gordon and Dr. Nancollas, already knew the procedure that each employed. (*See* Tr. (Burns) at 2127–2129; *see also* Tr. (Hutton) at 2160.)

Moreover, Condition 2 did not prohibit Dr. Gordon from registering concerns about quality so long as those complaints were made in writing to those persons with the authority and ability to address the issue. Dr. Gordon may have very well felt that these persons would be unable or unwilling to address his concerns and for that reason disseminated the June 4, 1997 letter to members of the Hospital's Board of Trustees. Yet, Dr. Gordon's belief in this regard was based on nothing more than rank speculation. The fact is, before the June 4, 1997 letter, Dr. Gordon never elected to file a written complaint about Dr. Nancollas. Even this complaint, however, was disruptive to the Hospital's orderly operation because he addressed the letter to over thirty people, including the entire Board of Directors. Because not every medical concern equals a medical crisis, there is no need to copy the Board when a physician raises an ordinary com-

cy eye surgery facility services, Plaintiffs failed to meet their initial burden. *See supra* at Part II.A.1.d. The court has included this portion of its opinion merely to illustrate that

even if Plaintiffs had met their initial burden, their unreasonable restraint on competition claim would still fail.

plaint about medical care. Many members of the Board are not physicians and are unable to distinguish between mere complaints and medical issues going to the very core of the Hospital's existence. For this reason, the Hospital sought to channel Dr. Gordon's complaints through the Hospital Administration and the Medical–Dental Staff, the entities charged with overseeing the Hospital's day-to-day operations and medical issues. This was not an unreasonable requirement, nor was it one which was unique to Dr. Gordon.

Plaintiffs also claim that, "Condition 3 barred *any* communication with *any* patient in the area, at *any* time, if it included *any* comment about another ophthalmologist." (*Id.* at ¶ 71.) Thus, Plaintiffs claim Condition 3 prevented Dr. Gordon from using comparative advertising. However, it is clear that Condition 3 did not prevent Dr. Gordon from advertising because he placed at least two ads while Condition 3 was in effect, one of which laid out the comparative benefits of the phaco procedure over the ECCE procedure. Instead, a reasonable reading of Condition 3 was that it prevented Dr. Gordon from contacting Dr. Nancollas' patients, or any other physician's patients, to tell them that Dr. Nancollas was an inferior physician. This is the purpose and effect of Condition 3. *See Chicago Bd. of Trade*, 246 U.S. at 238, 38 S.Ct. 242 ("[K]nowledge of intent may help the court to interpret facts and to predict consequences.").

Plaintiffs also claim that Conditions 2 and 3 were overly broad because if the Hospital's intention was to curb Dr. Gordon's discourteous conduct, Condition 1 served . this end adequately.[46] However, the Hospital did not merely wish to make Dr. Gordon play nicely. The Hospital wanted to channel Dr. Gordon's complaints regarding quality care into appropriate channels and to prevent him from calling Dr. Nancollas' patients to comment upon Dr. Nancollas' competency. These restrictions were necessary to limit the Hospital's exposure to potential malpractice law suits and to insulate patients' exposure to competition among physicians to appropriate settings. Dr. Gordon did not seem to understand, or refused to comply with, these reasonable limits on his ability to practice medicine at the Hospital. Condition 1 would not make these limitations clear. Conditions 2 and 3, therefore, were necessary to make Dr. Gordon perfectly aware of his obligations with respect to registering internal complaints and contacting patients of other physicians.

.Given Dr. Gordon's extensive history of calling and otherwise contacting Dr. Nancollas' patients to comment on his medical competency, Conditions 2 and 3 were not only reasonable, but required. Dr. Gordon's reckless remarks exposed the Hospital to potential medical malpractice law suits. Moreover, the Hospital's "public service" function also required that the Hospital, to a limited extent, shield patients from the oftentimes harsh realities of capitalistic competition. Hospitals are not only in the business of making money, they also exist to help patients get better. Thus, the Hospital has a vested interest in making sure that patient care takes precedence over physician profit. Policies that enforce this position, however, are not anathematic to business competition. Instead, by regulating the context in which competition occurs, these policies emphasize the Hospital's commitment to quality patient care which, of course, raises es-

---

**46.** Condition 1 stated the following: "You must treat Hospital personnel and physicians practicing at Lewistown Hospital in a courteous and professional manner. This means that you shall not raise your voice, swear, or in any way demean, belittle, or berate any Hospital personnel or physician practicing at the Hospital." (Def.Ex. 227(A)(11).)

teem for the Hospital among the public, the ultimate consumers of the Hospital's services. *See Weiss*, 745 F.2d at 821 n. 60 (holding that excluding disruptive physicians from a hospital's staff furthers competition and increases the hospital's efficiency thereby making the hospital a more attractive option to potential consumers).

In this sense, Conditions 2 and 3 furthered the pro-competitive objective of improving the Hospital's service quality. Therefore, the court finds that these restraints on competition, in the end analysis, merely regulate competition and thus are not unreasonable restraints on trade in the relevant antitrust markets. As a result, Plaintiffs' claim in Count I fails, and the court will enter judgment in favor of the Hospital as to that claim.

### B. *Count II: Illegal Tying Arrangement*

"Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound and Custom Tops v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir.1992) (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir.1977)). "[C]ertain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *'per se.'*" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). "It is clear, however, that not every refusal to sell two products separately can be said to restrain competition." *Id.* at 11. With respect to tying arrangements, the Supreme Court has stated that following:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different

terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Id.* at 12, 104 S.Ct. 1551.

### 1. *Per Se* Analysis

■ The Third Circuit has stated that for a tying arrangement to be declared invalid under the *per se* analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share in the tying product market, and (3) a substantial amount of interstate commerce is affected. *See Brokerage Concepts, Inc. v. U.S. Healthcare*, 140 F.3d 494, 512–13 (3d Cir.1998); *see also Town and Sound Custom Tops*, 959 F.2d at 477. "Where such elements are shown, the defendant's tying practices are condemned without further proof of antitrust injury." *Brokerage Concepts, Inc.,* 140 F.3d at 513; *accord Town and Sound Custom Tops*, 959 F.2d at 477.

■ In Count II, Plaintiffs claim that the Hospital has tied the provision of its facility services to Dr. Nancollas' physician services. Even assuming the existence of a tie, it is clear that Plaintiffs' claims with respect to the outpatient cataract and inpatient eye surgery markets are not subject to *per se* analysis. *See Town Sound and Custom Tops*, 959 F.2d at 478–79 (holding that *Jefferson Parish* established that only when the plaintiff has proven market power in the tying product market may the court subject the defendant to *per se* liability). As stated above, Plaintiffs have failed to demonstrate that the Hospital possesses market power with respect to those markets. *See supra* at Parts II. A.1.b. Thus, Plaintiffs' claims with respect to these markets are more properly analyzed under the rule of reason test. *See infra* at Part II.B.2. However, Plaintiffs' have proved that the Hospital possessed

market power in the market for emergency eye surgery facility services market. *See supra* at Part II.A.1.b. Therefore, Plaintiffs will prevail on their claim regarding emergency eye surgery services if they proved that (1) the Hospital tied the provision of emergency eye surgery facility services to the patient's use of Dr. Nancollas to provide those services, and (2) that tie affected a substantial amount of interstate commerce. *See Town Sound and Custom Tops,* 959 F.2d at 477 (holding that if the plaintiff satisfies the three-part *per se* tying test, "then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect").

To be classified as having a substantial effect on interstate commerce, a tie must be "substantial enough in terms of dollar volume so as not to be merely *de minimis.*" *Fortner Enters. v. U.S. Steel,* 394 U.S. 495, 501, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (citations omitted). With respect to the effect of Dr. Gordon's exclusion on interstate commerce, Plaintiffs contend that courts have treated as substantial ties whose effect measured as little as $10,091.07. *See Tic X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407, 1419 (11th Cir.1987).

In this case, however, Plaintiffs have presented absolutely no evidence whatsoever regarding the dollar volume effect in the allegedly tied market: emergency eye surgery physician services.[47] At trial, Plaintiffs presented anecdotal evidence regarding two patients who, subsequent to Dr. Gordon's exclusion, sought out emergency eye treatment at the Hospital and were forced to use Dr. Nancollas or to

seek treatment at hospitals in distant locales.[48] However, only one of these patients, William Hawk, actually received what can be classified as an emergency eye surgery procedure; the product market that Plaintiffs allege has been tied. Plaintiffs presented no evidence about how much either of these patients were charged for the physician services they received. Likewise, Plaintiffs presented absolutely no other evidence regarding how much dollar volume business has been affected by the Hospital's alleged tie. Given that the Plaintiffs have failed to present any such evidence regarding this matter, the court cannot rightly say that the Hospital's alleged tie affected a substantial amount of interstate commerce. Accordingly, Plaintiffs' claim regarding the Hospital's alleged tying of the facilities and physician services markets for emergency eye surgery fails the *per se* analysis and must be analyzed under the rule of reason.

### 2. Rule of Reason Analysis

 Unlike a *per se* case—where if the plaintiff satisfies the required elements, the court infers that the defendant is using its market power in the tying market to expand into the tied market—to succeed under the rule of reason, the plaintiff must prove (1) a tying arrangement, and (2) an injury to competition. *Brokerage Concepts,* 140 F.3d at 519 (quoting *Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. 1551). Of course, the plaintiff must also prove that the defendant's alleged tie caused the injury to competition. *See Town and Sound Custom Tops,* 959 F.2d at 486–87 ("A plaintiff must link the two showings with a

---

**47.** The court has already recognized that the Hospital is engaged in business affecting interstate commerce. *See supra* at Part I.A. Yet, this does not relieve Plaintiffs' obligation to prove that the alleged tying arrangement affected a substantial amount of interstate commerce in the relevant tied market.

**48.** Beverly Hawk, however, testified only as to the treatment rendered to her husband, William Hawk. This makes no difference. The court finds her testimony credible.

theory of causation that is both plausible and cognizable by the anti-trust laws.").

■ Above, the court has already held that no injury to competition occurred in either the markets for outpatient cataract surgery and inpatient eye surgery physician services markets. *See supra* at Part II.A.1.c. Moreover, to the extent any injury to competition occurred in any of the relevant physician services markets, the Conditions of Reappointment did not proximately cause it. *Id.* Additionally, the court has held that even if the court were to find that Plaintiffs met their initial burden under the rule of reason, the Hospital met its burden of demonstrating that the decision to impose the Conditions of Reappointment served pro-competitive justifications. *See supra* at Part II.A.2. Similarly, the decision to revoke Dr. Gordon's staff privileges for violating the Conditions also serves the same pro-competitive justification. *Id.* Finally, the court held that the Hospital's decision to impose the Conditions of Reappointment, on the whole, furthered, rather hindered competition. *See supra* at Part II.A.3.

Essentially, the court's holding regarding Count I are equally applicable to the rule of reason analysis of Plaintiffs' tying claim in Count II. The court sees no reason to rehash them in what is already a lengthy opinion. The court, however, will say that whatever tying arrangement occurred in this case was unintentional and did not injure competition in any of the relevant markets. To the extent any injury to competition occurred, such injury is attributable to Dr. Gordon's conduct, not the Hospital's decision to impose the Conditions of Reappointment and, ultimately, to exclude Dr. Gordon from the Medical–Dental Staff. Finally, even if Plaintiffs proved an injury to competition based on the Hospital's decisions to impose the Conditions of Reappointment and to exclude Dr. Gordon, those decisions were justified by pro-competitive motivations which on the whole furthered, rather than hindered, competition in the relevant markets. Thus, Plaintiffs' claim in Count II must fail, and the court will grant judgment in favor of the Hospital on that claim.

### C. Count III: Attempted Monopolization

■ In Count III, Plaintiffs claims that the Hospital attempted to monopolize the general outpatient cataract surgery market in violation of Section 2 of the Sherman Act. *See* 15 U.S.C. § 2.[49] To prevail on a claim of attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

■ The court finds that Plaintiffs' Section 2 claim must fail because they have failed to convince the court that the Hospital acted with a specific intent to monopolize any of the relevant antitrust markets at issue in this case. Instead, the court finds that the Hospital acted to discipline a persistently obstreperous physician

---

**49.** Section 2 of the Sherman Act reads as follows:

Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments in the discretion of the court. 15 U.S.C. § 2. Of course, a private party may sue to enforce the provisions of the Sherman Act. *See LePage's Inc. v. 3M,* 324 F.3d 141, 146 (3d Cir.2003).

who stubbornly refused to comply with the standards of courtesy and professionalism expected of a medical doctor. The Hospital did not seek, through its discipline of Dr. Gordon, to achieve a monopoly in the outpatient cataract surgery facility services market or to give Dr. Nancollas extra business in the physician services component of this market due to his affiliation with Geisinger. Instead, the Hospital had reached its breaking point and sought to rid itself of a physician whose conduct was detrimental to Hospital staff morale. To the extent Plaintiffs argue that certain conduct by McAleer—that is, his conversations with Dr. Powers and Dr. Cillo—demonstrates either a specific intent to monopolize or predatory conduct, the court finds that McAleer's motivation was more likely a personal dislike for Dr. Gordon, rather than a fear that he would rob the Hospital of its market share for outpatient cataract surgery services.[50]

Because, on the whole, the evidence did not demonstrate that the Hospital specifically intended to monopolize, Plaintiffs' claim in Count III must fail. The court, therefore, need not further discuss the other elements of this claim. Specific intent to monopolize is a required element, and failure to prove it is fatal to Plaintiffs' Section 2 claim. Accordingly, the court will enter judgment in favor of the Hospital on Count III.

### D. Other Pending Motions

On November 12, 2002, the Hospital filed a motion to strike Plaintiffs' proposed findings of fact and conclusions of law. On December 20, 2002, the Hospital filed an identical motion with respect to Plaintiffs' supplemental proposed findings of fact and conclusions of law. Because the court will enter judgment in favor of the Hospital on all counts, it need not address the Hospital's motions. Accordingly, the court will deny, as moot, the Hospital's motions to strike.

### E. Evidentiary Matters

At trial, the court deferred ruling on the admissibility of fifty-two Hospital exhibits. Plaintiffs objected to the introduction of these exhibits on the basis that their introduction would violate the court's order of November 8 which limited what evidence would be admissible with regards to Dr. Gordon's disciplinary history at the Hospital. Specifically, that order indicated that to avoid conducting mini-trials regarding Dr. Gordon's conduct, the court would limit introduction of Dr. Gordon's disciplinary history to those events occurring after 1990, so long as that evidence related to the concerns addressed by paragraphs 2 and 3 of the Conditions of Reappointment. See Gordon v. Lewistown Hosp., No. 1:CV–99–1100, order (Nov. 8, 2001); see also id., order at ¶ 5 (April 2, 2002).

After reviewing these exhibits, the court finds that thirteen of these exhibits are irrelevant and their admission would be inconsistent with the court's previous rulings. (See Def. Exs. 226(A)(20 and 25), 226(J)(2–5), 231(19), (24), (28), (34), (37), (38), and (39).) Additionally, Plaintiffs relied upon three of the "reserved" exhibits in either their original or supplemental proposed findings of fact and conclusions of law. (See Def. Exs. 227(A)(6), (7), and (9).) By relying on these exhibits, Plaintiffs waived any objection to their admission. Accordingly, the court will admit those exhibits. As to the remaining thirty-six exhibits, the court finds that these exhibits are relevant and admissible for at

---

**50.** Moreover, McAleer did not join the Hospital Administration until March 30, 1998. (*See Def. Ex. 557 at p. 5, Ins. 1–4.*) Therefore, he did not take part in the decisions to impose the Conditions of Reappointment and to ultimately exclude Dr. Gordon from the Medical-Dental Staff.

least some limited purpose. (*See* Def. Exs. 226(A)(6 and 7), (15–18), (33), (35), (45), (50), (52), 226(I), (J)(1), 227(A)(1), (A)(8), (10–20), (E), (H), (I), (J)(3 and 5), 231(2, 10, 21, 29, and 40).) Thus, the court will admit these exhibits into the record.

### III. *Conclusions of Law*

1. The following exhibits are admitted into the record: Def. Exs. 226(A)(6 and 7), (15–18), (33), (35), (45), (50), (52), 226(I), (J)(1), 227(A)(1), (6–20), (E), (H), (I), (J)(3 and 5), and 231 (2, 10, 21, 29, and 40).

2. The following exhibits are excluded from the record: Def. Exs. 226(A)(20 and 25), 226(J)(2–5), 231(19), (24), (28), (34), (37), (38), and (39).

3. The court's subject matter jurisdiction is based on 28 U.S.C. § 1331.

4. Plaintiffs failed to meet their burden of demonstrating that the Hospital's decision to impose the Conditions of Reappointment constituted an unreasonable restraint on trade in violation of Section 1 of the Sherman Act. *See* 15 U.S.C. § 1.

5. Plaintiffs failed to meet their burden of demonstrating that the Hospital's decision to impose the Conditions of Reappointment and to ultimately exclude Dr. Gordon from the Hospital's Medical–Dental Staff constituted an illegal tying arrangement in violation of Section 1 of the Sherman Act. *See id.*

6. Plaintiffs failed to meet their burden of demonstrating that the Hospital's actions constituted an attempt to monopolize the general outpatient cataract surgery services market in violation of Section 2 of the Sherman Act. *See id.* at § 2.

7. As Plaintiffs failed to prove a violation of the Sherman Act, they are not entitled to any form of injunctive relief. An appropriate order will follow.

### APPENDIX
### 1996 OUTPATIENT CATARACT SURGERY PATIENT MIGRATION DATA SORTED ACCORDING TO IMPORTANCE TO THE HOSPITAL

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| 17044 | 241 | 210 | 87.1% | 33.9% | 33.9% | 87.1% |
| 17084 | 41 | 37 | 90.2% | 6.0% | 39.9% | 87.6% |
| 17004 | 41 | 32 | 78.0% | 5.2% | 45.1% | 86.4% |
| 17059 | 44 | 32 | 72.7% | 5.2% | 50.2% | 84.7% |
| 17063 | 32 | 29 | 90.6% | 4.7% | 54.9% | 85.2% |
| 17066 | 55 | 26 | 47.3% | 4.2% | 59.1% | 80.6% |
| 17841 | 39 | 25 | 64.1% | 4.0% | 63.2% | 79.3% |
| 17051 | 28 | 22 | 78.6% | 3.5% | 66.7% | 79.3% |
| 17082 | 26 | 18 | 69.2% | 2.9% | 69.6% | 78.8% |
| 16652 | 120 | 17 | 14.2% | 2.8% | 72.4% | 67.2% |
| 17094 | 20 | 15 | 75.0% | 2.4% | 74.8% | 67.4% |
| 17099 | 14 | 14 | 100.0% | 2.3% | 77.0% | 68.0% |
| 17009 | 13 | 11 | 84.6% | 1.8% | 78.8% | 68.3% |
| 16823 | 193 | 11 | 5.7% | 1.8% | 80.6% | 55.0% |
| 17021 | 14 | 8 | 57.1% | 1.3% | 81.9% | 55.1% |
| 17058 | 7 | 7 | 100.0% | 1.1% | 83.0% | 55.4% |
| 17049 | 12 | 7 | 58.3% | 1.1% | 84.2% | 55.4% |
| 17243 | 23 | 7 | 30.4% | 1.1% | 85.3% | 54.8% |
| 17029 | 6 | 5 | 83.3% | .8% | 86.1% | 55.0% |
| 17264 | 17 | 5 | 29.4% | .8% | 86.9% | 54.6% |
| 17086 | 19 | 5 | 26.3% | .8% | 87.7% | 54.2% |
| 17054 | 4 | 4 | 100.0% | .6% | 88.4% | 54.2% |
| 17035 | 5 | 4 | 80.0% | .6% | 89.0% | 54.3% |
| 16853 | 23 | 4 | 17.4% | .6% | 89.7% | 53.5% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 16827 | 24 | 4 | 16.6% | .6% | 90.3% | 52.7% |
| 17842 | 86 | 4 | 4.7% | .6% | 90.9% | 49.1% |

KEY

| | | |
|---|---|---|
| A | = | ZIP CODE |
| B | = | TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD OUTPATIENT CATARACT SURGERY IN 1996 |
| C | = | TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD OUTPATIENT CATARACT SURGERY AT THE HOSPITAL IN 1996 |
| D | = | HOSPITAL'S SHARE OF ZIP CODE |
| E | = | ZIP CODE'S INDIVIDUAL CONTRIBUTION TO TOTAL NUMBER OF OUTPATIENT CATARACT SURGERIES PERFORMED AT THE HOSPITAL IN 1996 |
| F | = | CUMULATIVE ZIP CODES' CONTRIBUTION TO TOTAL NUMBER OF OUTPATIENT CATARACT SURGERIES PERFORMED AT HOSPITAL IN 1996 ("LIFO") |
| G | = | THE HOSPITAL'S SHARE OF THE AGGREGATE ZIP CODES ("LOFI") |

## EXHIBIT B

### 1996 OUTPATIENT CATARACT SURGERY PATIENT MIGRATION DATA ASSUMING THAT 61 PROCEDURES WERE PERFORMED AT FREESTANDING SURGERY CENTERS

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| * | 61 | 61 | 0.0% | 0.0% | 0.0% | 0.0% |
| 17099 | 14 | 14 | 100.0% | 2.6% | 2.6% | 18.7% |
| 17058 | 7 | 7 | 100.0% | 1.1% | 3.4% | 25.6% |
| 17054 | 4 | 4 | 100.0% | .6% | 4.0% | 29.1% |
| 17002 | 2 | 2 | 100.0% | .3% | 4.4% | 30.7% |
| 17056 | 2 | 2 | 100.0% | .3% | 4.7% | 32.2% |
| 17063 | 32 | 29 | 90.6% | 4.7% | 9.4% | 47.5% |
| 17084 | 41 | 37 | 90.2% | 6.0% | 15.3% | 58.3% |
| 17044 | 241 | 210 | 87.1% | 33.9% | 49.3% | 75.5% |
| 17009 | 13 | 11 | 84.6% | 1.8% | 51.0% | 75.7% |
| 17029 | 5 | 6 | 83.3% | .8% | 51.8% | 75.9% |
| 17035 | 4 | 5 | 80.0% | .6% | 52.5% | 75.9% |
| 17051 | 28 | 22 | 78.6% | 3.6% | 56.1% | 76.1% |
| 17004 | 41 | 32 | 78.5% | 5.2% | 61.2% | 76.3% |
| 17094 | 20 | 15 | 75.0% | 2.4% | 63.7% | 76.2% |
| 17059 | 44 | 32 | 72.7% | 5.2% | 68.8% | 75.9% |
| 17082 | 26 | 18 | 69.2% | 2.9% | 71.7% | 75.6% |
| 17841 | 39 | 25 | 64.1% | 4.0% | 75.8% | 74.9% |
| 17049 | 12 | 7 | 58.3% | 1.1% | 76.9% | 74.6% |
| 17021 | 14 | 8 | 57.1% | 1.3% | 78.2% | 74.2% |
| 17076 | 2 | 1 | 50.0% | .2% | 78.4% | 74.2% |
| 17066 | 55 | 26 | 47.3% | 4.2% | 82.6% | 72.1% |
| 17052 | 15 | 7 | 46.7% | 1.1% | 83.7% | 71.5% |
| 17229 | 7 | 3 | 42.9% | .5% | 84.2% | 71.3% |

KEY

| | | |
|---|---|---|
| * | = | ASSUMPTION THAT 61 PATIENTS IN MIFFLIN AND JUNIATA COUNTIES HAD OUTPATIENT CATARACT SURGERY AT FREE STANDING SURGERY CENTERS IN 1996 |
| A | = | ZIP CODE |
| B | = | TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD OUTPATIENT CATARACT SURGERY IN 1996 |
| C | = | TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD OUTPATIENT CATARACT SURGERY AT THE HOSPITAL IN 1996 |

452

D = HOSPITAL'S SHARE OF ZIP CODE
E = ZIP CODE'S INDIVIDUAL CONTRIBUTION TO TOTAL NUMBER OF OUTPATIENT CATARACT SURGERIES PERFORMED AT THE HOSPITAL IN 1996
F = CUMULATIVE ZIP CODES' CONTRIBUTION TO TOTAL NUMBER OF OUTPATIENT CATARACT SURGERIES PERFORMED AT HOSPITAL IN 1996 ("LIFO")
G = THE HOSPITAL'S SHARE OF THE AGGREGATE ZIP CODES ("LOFI")

## EXHIBIT C

◇Home ◇Help

### driving directions

* North America
* Europe
* Saved Routes

**What's Nearby**

Search 2 ⊠ miles for:

◦ BORDERS™

◦

◦

[Search]

**Orbitz Travel Deals**

⊿ **Flights:**
Find low fares to your destination!

⊿ **Rental Cars:**
Find special offers on rental prices in your destination!

⊿ **Lodging:**
Save up to 70% on Orbitz Savers nationwide. Search Huntingdon, PA!

**ORBITZ**

**Yellow Pages**
Search **Huntingdon** for:

[Auto repair ▾]

[Search]

**FROM:**
400 Highland Ave
Lewistown, PA
17044-1167 US

Total Distance: 35.55 miles
Total Estimated Time:
56 minutes

**TO:**
[700-717] Warm Springs Ave
Huntingdon, PA
16652 US

☐ Special Offers for
[Hotels ▾] [Go]

E-mail Route: [ ]

[user@email.com] [Go] Or, Send to a PCS Phone **Sprint.**

[LINK ROUTE] [SAVE ROUTE] [REVERSE ROUTE] [DOWNLOAD TO PDA]

[ FASTEST ROUTE ] [ SHORTEST ROUTE ] [ AVOID HIGHWAYS ]

| DIRECTIONS | DISTANCE |
|---|---|
| **1:** Start out going Southeast on 4TH ST toward HIGHLAND AVE. | 0.08 miles |
| **2:** Turn RIGHT onto ELECTRIC AVE. | 0.35 miles |
| **3:** ELECTRIC AVE becomes VALLEY ST. | 0.83 miles |
| **4:** Turn SLIGHT RIGHT onto E 3RD ST. | 0.62 miles |
| **5:** Turn RIGHT onto US-22/ US-522/ N JUNIATA ST. Continue to follow US-22. | 32.23 miles |
| **6:** Take the ramp toward PA-26 N. | 0.16 miles |
| **7:** Stay straight to go onto PENN ST. | 0.73 miles |
| **8:** Turn RIGHT onto 4TH ST. | 0.19 miles |
| **9:** Turn LEFT onto MOORE ST. | 0.16 miles |
| **10:** Turn RIGHT onto 6TH ST. | 0.07 miles |
| **11:** Turn LEFT onto WARM SPRINGS RD. | 0.13 miles |
| **12:** Stay straight to go onto 7TH ST. | 0.01 miles |

**Total Estimated Time:** **Total Distance:** 35.55 miles
56 minutes

**Need a hotel, car, or flight?**
**Search Now!**

**Find**

Save up
on Orbit
Nationwi
Search

**Orbit**

**ROUTE OVERVIEW:**

▲ NORTH ▲

454

CLICKING ON MAP WILL: ○ Zoom In ● Re-center

All rights reserved. Use Subject to
License/Copyright

Map Legend

**DESTINATION:**

**[700-717] Warm Springs Ave
Huntingdon, PA
16652 US**

©2003 MapQuest.com, Inc.; ©2003 GDT, Inc.

**Re-display Directions with:**

● Overview Map with Text ○ Text Only ○ Turn-by-Turn Maps with Text

RE-DISPLAY ROUTE

These directions are informational only. No representation is made or warranty given as to
their content, road conditions or route usability or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from
such use.

Site Index | About MapQuest | Partners | Help Center

# EXHIBIT D

 

«Home »Help MAPS DRIVING ROAD TRIP
 DIRECTIONS PLANNER

## driving directions

* North America
* Europe
* Saved Routes

**What's Nearby**

Search 2 miles for:

 ○ BORDERS'

 ○

 ○

**Search**

**Orbitz Travel Deals**

♩ **Flights:**
Find low fares to your
destination!

♩ **Rental Cars:**
Find special offers on
rental prices in your
destination!

♩ **Lodging:**
Save up to 70% on
Orbitz Savers
nationwide. Search
State College, PA!

**ORBITZ**

**Yellow Pages**

Search **State College**
for:

Auto repair
~Search

**FROM:**

400 Highland Ave
Lewistown, PA
17044-1167 US

Total Distance: 31.03 miles
Total Estimated Time:
39 minutes

**TO:**

1850 E Park Ave
State College, PA
16803-6706 US

☑ Special Offers for
Hotels ▼ Go

**E-mail Route:**

user@email.com Go Or, Send to a PCS Phone ◆Sprint.

| PRINT ROUTE | SAVE ROUTE | REVERSE ROUTE | DOWNLOAD TO PDA |

| **FASTEST ROUTE** | **SHORTEST ROUTE** | **AVOID HIGHWAYS** |

| DIRECTIONS | DISTANCE |
|---|---|
| **1:** Start out going Southeast on 4TH ST toward HIGHLAND AVE. | 0.08 miles |
| **2:** Turn RIGHT onto ELECTRIC AVE. | 0.17 miles |
| **3:** Merge onto US-322 W. | 29.17 miles |
| **4:** Take the exit toward PENN STATE UNIV/ RESEARCH PARK. | 0.30 miles |
| **5:** Turn LEFT onto PARK AVE. | 1.30 miles |

**Total Estimated Time:** **Total Distance:** 31.03 miles
39 minutes

**Need a hotel, car, or flight?**
**Search Now!**

**ROUTE OVERVIEW:**

▲ NORTH ▲

ZOOM
IN

Can

BACK
OUR
PRIC
GUAF

2003 Voll
Get

2003 To
Get

2003 F
Get

Sea

**456**

All rights reserved. Use Subject to License/Copyright

Map Legend

**DESTINATION:**

**1650 E Park Ave**
**State College, PA**
**16803-6706 US**

**Re-display Directions with:**

- Overview Map with Text
- Text Only
- Turn-by-Turn Maps with Text

RE-DISPLAY ROUTE

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

Site Index | About MapQuest | Partners | Help Center

# EXHIBIT E

## driving directions

* North America
* Europe
* Saved Routes

What's Nearby

Search 2 miles for:

○ BORDERS'

○

○

Search

**Orbitz Travel Deals**

**× Hotels:**
Save up to 70% on Orbitz Savers nationwide. Search State College, PA!

**✓ Flights:**
Find low fares to your destination!

**↵ Rental Cars:**
Find special offers on rental prices in your destination!

**ORBITZ**

**Yellow Pages**

Search **State College** for:

Auto repair

Search

**FROM:**

Bellefonte, PA
16823 US

Total Distance: 11.70 miles
Total Estimated Time:
19 minutes

**TO:**

1850 E Park Ave
State College, PA
16803-6706 US

□ State College Offers for

Hotels Go!

Email Route:

user@email.com Go! Or, Send to a PCS Phone ◆ Sprint.

| FASTEST ROUTE | SHORTEST ROUTE | AVOID HIGHWAYS |

| DIRECTIONS | DISTANCE |
| --- | --- |
| **1:** Start out going Southeast on WILTSHIER DR toward JACKSONVILLE RD. | 0.08 miles |
| **2:** Turn RIGHT onto JACKSONVILLE RD. | 0.26 miles |
| **3:** JACKSONVILLE RD becomes E HOWARD ST. | 0.84 miles |
| **4:** Turn LEFT onto N ALLEGHENY ST/ PA-144. | 0.09 miles |
| **5:** Turn RIGHT onto W HIGH ST/ PA-550 S. Continue to follow PA-550 S. | 0.15 miles |
| **6:** Turn LEFT onto PA-150/ PA-550/ S WATER ST. Continue to follow PA-150. | 6.53 miles |
| **7:** PA-150 becomes E COLLEGE AVE/ PA-26 S. | 2.75 miles |
| **8:** Take the ramp toward PENN STATE UNIVERSITY. | 0.11 miles |
| **9:** Turn SLIGHT LEFT to take the ramp toward PHILIPSBURG. | 0.04 miles |
| **10:** Turn SLIGHT RIGHT onto N UNIVERSITY DR. | 0.74 miles |
| **11:** Turn RIGHT onto PARK AVE. | 0.12 miles |

**Total Estimated Time:** **Total Distance:** 11.70 miles
19 minutes

**Need a place to stay?**

Find a local hotel

**State Colle**

□ **Hotels**
Find lo
save

□ **Resort**
Get the
deals

□ **Vacati**
View lo
packag

□ **Mortg:**
Compa
rates

□ **Love**
Find yo

□ **Real E**
Homes

458

Find a New Home

**Search over 100,000 New Homes**
powered by homestore

- Enter a City - - Select a State - GO!

**ROUTE OVERVIEW:**

CLICKING ON MAP WILL: ○ Zoom In ● Re-center

All rights reserved. Use Subject to License/Copyright

Map Legend NAVTECH ON BOARD

**DESTINATION:**

**1850 E Park Ave
State College, PA
16803-6706 US**

**Re-display Directions with:**

**459**

&#x25C9; Overview Map with Text &#x25CB; Text Only &#x25CB; Turn-by-Turn Maps with Text

RE-DISPLAY ROUTE

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

Site Index | About MapQuest | Partners | Help Center
International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

460

# EXHIBIT F

## driving directions

* North America
* Europe
* Saved Routes

**What's Nearby**

Search 2 miles for:

○ BORDERS'

○

○

**Search**

**Orbitz Travel Deals**

⌐ Hotels:
Save up to 70% on Orbitz Savers nationwide. Search Lewistown, PA!

⌐ Flights:
Find low fares to your destination!

⌐ Rental Cars:
Find special offers on rental prices in your destination!

**Yellow Pages**

Search **Lewistown** for:

Auto repair ▾

**Search**

**FROM:**
Bellefonte, PA
16823 US

**Total Distance:** 31.04 miles
**Total Estimated Time:**
44 minutes

E-mail Route

 user@email.com ▶ Or, Send to a PCS Phone ◆ Sprint.

**ROUTE** | **MAP ROUTE** | **OVERVIEW ROUTE** | **DOWNLOAD ROUTE**

FASTEST ROUTE | SHORTEST ROUTE | AVOID HIGHWAYS

**TO:**
400 Highland Ave
Lewistown, PA
17044-1167 US

⊞ Lewistown Offers for
Hotels ▾ ▦

| | DIRECTIONS | DISTANCE |
|---|---|---|
| **1:** | Start out going Southeast on WILTSHIER DR toward JACKSONVILLE RD. | 0.08 miles |
| **2:** | Turn RIGHT onto JACKSONVILLE RD. | 0.26 miles |
| **3:** | JACKSONVILLE RD becomes E HOWARD ST. | 0.16 miles |
| **4:** | Turn LEFT onto MCALLISTER ST. | 0.30 miles |
| **5:** | Turn LEFT onto PA-550/ E BISHOP ST. Continue to follow PA-550. | 1.16 miles |
| **6:** | Merge onto PA-26 S. | 3.63 miles |
| **7:** | Turn LEFT onto S HARRISON RD. | 0.53 miles |
| **8:** | Turn SLIGHT LEFT onto S MAIN ST/ PA-144. Continue to follow PA-144. | 8.58 miles |
| **9:** | Take US-322 E. | 15.53 miles |
| **10:** | Take the exit toward ELECTRIC AVE. | 0.12 miles |
| **11:** | Turn LEFT onto ORT VALLEY RD. | 0.25 miles |
| **12:** | Turn LEFT onto ELECTRIC AVE. | 0.35 miles |
| **13:** | Turn LEFT onto 4TH ST. | 0.08 miles |

**Total Estimated Time:** 44 minutes **Total Distance:** 31.04 miles

Need a place to stay?

Find a local hotel!

Lewistown

■ **Hotels**
Find low
save

■ **Resort**
Get the
deals

■ **Vacati**
View lo
packag

■ **Mortg**
Compa
rates

■ **Love**
Find yo

■ **Real E**
Homes

ROUTE OVERVIEW:

CLICKING ON MAP WILL: ○ Zoom In ◉ Re-center

All rights reserved. Use Subject to License/Copyright Map Legend

Click net tt

DESTINATION:

**400 Highland Ave
Lewistown, PA
17044-1167 US**

©2003 MapQuest.com, Inc.; ©2003 GDT, Inc.

**Re-display Directions with:**

◉ Overview Map with Text ○ Text Only ○ Turn-by-Turn Maps with Text

[ RE-DISPLAY ROUTE ]

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from

**462**

such use.

Site Index | About MapQuest | Partners | Help Center
International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

**EXHIBIT G**

**1996 INPATIENT PATIENT MIGRATION DATA ORGANIZED ACCORDING TO ZIP CODE'S IMPORTANCE TO THE HOSPITAL**

| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
|---|---|---|---|---|---|---|
| 17044 | 3107 | 2647 | 85.2% | 37.6% | 37.6% | 85.2% |
| 17059 | 769 | 612 | 79.6% | 8.7% | 46.3% | 84.1% |
| 17051 | 532 | 360 | 67.7% | 5.1% | 51.4% | 82.1% |
| 17841 | 453 | 339 | 74.8% | 4.8% | 56.2% | 81.4% |
| 17084 | 401 | 324 | 80.8% | 4.6% | 60.8% | 81.4% |
| 17063 | 386 | 318 | 82.4% | 4.5% | 65.3% | 81.4% |
| 17004 | 414 | 309 | 74.6% | 4.4% | 69.7% | 81.0% |
| 17082 | 305 | 254 | 82.2% | 3.6% | 73.3% | 81.1% |
| 17009 | 268 | 223 | 83.2% | 3.2% | 76.5% | 81.2% |
| | | | **MINIMAL MARKET** | | | |
| 17049 | 282 | 208 | 73.8% | 3.0% | 79.4% | 80.9% |
| 17099 | 227 | 198 | 87.2% | 2.8% | 82.2% | 81.1% |
| 17058 | 254 | 193 | 76.0% | 2.7% | 85.0% | 80.9% |
| 17094 | 228 | 166 | 72.8% | 2.4% | 87.3% | 80.7% |
| | | | **OPTIMAL MARKET** | | | |
| 17066 | 723 | 148 | 20.5% | 2.1% | 89.4% | 75.5% |
| 17021 | 107 | 68 | 63.6% | 1.0% | 90.4% | 75.3% |
| 17035 | 80 | 59 | 73.8% | .8% | 91.2% | 75.3% |
| 17029 | 59 | 52 | 88.1% | .7% | 92.0% | 75.4% |
| | | | **MAXIMAL MARKET** | | | |
| 17086 | 198 | 42 | 21.2% | .6% | 92.6% | 74.1% |

**KEY**

A = ZIP CODE

B = TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD INPATIENT SURGERY IN 1996

C = TOTAL NUMBER OF PATIENTS IN ZIP CODE WHO HAD INPATIENT SURGERY AT THE HOSPITAL IN 1996

D = HOSPITAL'S SHARE OF ZIP CODE

E = ZIP CODE'S INDIVIDUAL CONTRIBUTION TO TOTAL NUMBER OF INPATIENT SURGERIES PERFORMED AT THE HOSPITAL IN 1996

F = CUMULATIVE ZIP CODES' CONTRIBUTION TO TOTAL NUMBER OF INPATIENT SURGERIES PERFORMED AT HOSPITAL IN 1996 ("LIFO")

G = THE HOSPITAL'S SHARE OF THE AGGREGATE ZIP CODES ("LOFI")

### ORDER

In accordance with the court's findings of fact and conclusions of law, **IT IS HEREBY ORDERED THAT:**

(1) The following exhibits are admitted into the record: Def. Exs. 226(A)(6 and 7), (15–18), (33), (35), (45), (50), (52), 226(I), (J)(1), 227(A)(1), (6–20), (E), (H), (I), (J)(3 and 5), and 231 (2, 10, 21, 29, and 40).

(2) The following exhibits are **INADMISSIBLE** and should be excluded from the record: Def. Exs. 226(A)(20 and 25), 226(J)(2–5), 231(19), (24), (28), (34), (37), (38), and (39);

(3) The Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiff on Counts I, II, and III of Plaintiffs' amended complaint;

(4) The Clerk of Court is directed to enter judgment as indicated by the court in its orders of May 21, 2001–granting summary judgment in favor of Defendant on Counts I, IV, V, VI, VII, and VIII—and August 15, 2001—granting Plaintiffs' motion for reconsideration as to Count I;

(5) Defendant's motion to strike Plaintiffs' proposed findings of fact and conclusions of law is **DENIED AS MOOT**;

(6) Defendant's motion to Plaintiffs' supplemental proposed findings of fact and conclusions of law is **DENIED AS MOOT**;

(7) The court will not entertain a motion for a new trial and will deny any such request *sua sponte.* If either party disagrees with any of the court's findings of fact or conclusions of law, they should seek relief from the United States Court of Appeals for the Third Circuit; and

(8) The Clerk of Court is directed to close the case file.